# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2993

_____

United States of America,                    *
                                              *
            Appellee,                         *
                                              * Appeal from the United States
    v.                                        * District Court for the
                                              * Western District of Missouri.
Mark A. Gannon,                               *
                                              *
            Appellant.                        *


_____

Submitted: April 17, 2008
Filed: July 7, 2008

_____

Before WOLLMAN, BEAM, and RILEY, Circuit Judges.

_____

BEAM, Circuit Judge.

    Mark A. Gannon pled guilty to one count of conspiracy to possess and distribute pseudoephedrine, in violation of 21 U.S.C. §§ 841(c)(2) and 846. Gannon reserved his right to appeal the district court's[1] denial of his motion to suppress. Gannon now appeals the denial. He argues that the police violated his Fourth Amendment rights because they lacked reasonable suspicion to stop and detain him.

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri, adopting the Report and Recommendation of the Honorable John T. Maughmer, United States Magistrate Judge for the Western District of Missouri.

Gannon also contends that his confession and other statements made to police were involuntarily made. We affirm.

## I.    BACKGROUND

On October 8, 2002, Detective John Howe, of the Independence, Missouri, police department, received a telephone call from David Akers, a loss prevention officer employed by Wal-Mart in Independence. Akers was responsible for security and had training in monitoring customers who may be purchasing precursors to the manufacture of methamphetamine, such as pseudoephedrine pills.

Akers informed Howe of the following. A white female purchased two packs of Equate Antihistabs. She exited the store and got into a white Pontiac Bonneville. Already inside the Bonneville, was a white man who had a Wal-Mart shopping bag filled with unknown items. In a second call made by Akers to Howe a few minutes later, Akers reported that a white man (later identified as Gannon), who had been in a brown Oldsmobile Sierra, approached the Bonneville and began talking with the occupants. During the conversation, Gannon and the man inside the Bonneville exchanged money.

While en route to Wal-Mart, Howe ran a computer check on the Bonneville and learned that it was registered to Clifford Swann and Betty Heim, both of Carthage, Missouri. When Howe arrived at the Wal-Mart, he saw Gannon standing next to the Bonneville. The Bonneville drove off before Howe approached the car, but Howe ordered another officer to stop it. While the other officer stopped the Bonneville, Howe and Detective Brian Graham approached Gannon, who had returned to his car. The detectives, who were in plain clothes, asked Gannon if he would exit the car so that they could speak to him. He did. The detectives then informed Gannon that they had stopped him because of suspicious purchases and activity. They then sought Gannon's consent to search the Oldsmobile. Gannon agreed to a search of the car,

which resulted in the detectives finding two packs of Equate Antihistab inside a Wal-Mart shopping bag.

After Howe and Graham searched the Oldsmobile, Howe went to search the Bonneville and Graham stayed with Gannon. A search of the Bonneville revealed four packs of Equate Antihistabs. Swann, the passenger in the Bonneville, told Howe that another individual planned to use the pills to manufacture methamphetamine. While Howe searched the Bonneville, Graham observed Gannon waive off a white female who was approaching. Graham stopped the woman; identified her as Patricia Gannon, Gannon's ex-wife; and found two boxes of Equate Antihistabs on her.

The detectives placed Gannon under arrest and advised him of his <u>Miranda</u> rights. Gannon, however, wanted to make a statement to police. Gannon told police that the pills were going to be used to manufacture methamphetamine. Gannon also tried to clear Patricia's involvement. Nonetheless, the detectives also arrested Patricia and took her and Gannon to the Independence Police Department.

At the police station, Gannon signed a written <u>Miranda</u> rights waiver. He also initialed each right. Before, however, Gannon signed the form, Howe informed Gannon that he did not have to sign the form and did not have to talk with Howe or Detective Joe Fanara, the other detective at the station. After Gannon signed and initialed the waiver, he read the form to the detectives, which was standard procedure. The detectives then interviewed Gannon and prepared a written statement, which Gannon also signed.

Gannon later moved to suppress the Equate pills and his confession and other statements made to police. Gannon claimed that the evidence was obtained in violation of his Fourth Amendment right to be free from unreasonable searches and seizures, because the police lacked reasonable suspicion to stop him. He also alleged that all the statements, including his confession, were made involuntarily after the

police threatened that Patricia would go to jail if he did not cooperate. Howe, however, testified that neither he nor any other officer threatened Gannon or told Gannon that if he did not cooperate, Patricia would go to jail. The magistrate judge, who conducted the hearing, found Gannon's contention of threats incredulous and concluded that no such threats were made. The magistrate judge also ruled that the detectives' experience in dealing with the sale of methamphetamine precursors, particularly in Independence, coupled with Akers' report, created reasonable suspicion to stop Gannon. Gannon now challenges both conclusions.

## II.   DISCUSSION

Gannon challenges the district court's denial of his motion to suppress on two grounds. The police lacked reasonable suspicion to stop him, and his statements and confession were made involuntarily. We review a district court's denial of a motion to suppress de novo, but review its underlying factual determinations for clear error, giving due weight to the inferences of the district court and law-enforcement officials. United States v. Coleman, 349 F.3d 1077, 1083 (8th Cir. 2003). We also accord a district court's credibility determinations great deference. United States v. Gregory, 302 F.3d 805, 811 (8th Cir. 2002).

### A.   Fourth Amendment

Gannon first contends that the district court erred by ruling that the detectives' stop was supported by reasonable suspicion.[2] The Fourth Amendment provides that

---

[2]Neither the district court below, nor the government raised the issue of whether the detectives' actions even needed to rise to the level of a Terry stop. Indeed, the police may approach an individual and ask him a few questions, even if the police lack reasonable suspicion, so long as the encounter is consensual and "a reasonable person would feel free 'to disregard the police and go about his business.'" Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)).

"[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. This protection extends to one's automobile. See Delaware v. Prouse, 440 U.S. 648, 662-63 (1979).

The law distinguishes between a seizure and a stop. Terry v. Ohio, 392 U.S. 1, 10 (1968). While police must have probable cause in order to arrest (or seize) a person, they need only have reasonable suspicion that criminal activity is afoot to stop someone. Id. at 27. There is no "neat set of legal rules" that governs the determination whether the police had reasonable suspicion. United States v. Barker, 437 F.3d 787, 789 (8th Cir. 2006) (internal quotations omitted). An officer's suspicion is reasonable if he "knows particularized, objective facts that lead to a rational inference that a crime is being or has been committed." United States v. Hernandez-Hernandez, 327 F.3d 703, 706 (8th Cir. 2003). But reasonable suspicion is more than an inarticulable hunch, it must instead be based on specific and articuable facts, which taken together with rational inferences, support the stop. Terry, 392 U.S. at 27. To determine whether the police had reasonable suspicion, we must examine the totality of the circumstances. Barker, 437 F.3d at 790. We must consider these circumstances "through the eyes of the officers, because they are trained to cull significance from behavior that would appear innocent to the untrained observer." Id. (internal quotations omitted).

Here, a reasonable view of the evidence supports the district court's conclusion that the detectives had reasonable suspicion sufficient to conduct a Terry stop of

Furthermore, the police may, even if they lack a basis to suspect a particular individual committed a crime, request consent to search the individual's property, "as long as the police do not convey a message that compliance with their requests is required." Id. at 434-35. Because we conclude that the detectives had reasonable suspicion to stop Gannon, we need not decide the precedent question of whether the police's conduct even constituted a Terry stop.

Gannon. Indeed, the evidence shows that before Howe arrived at the Wal-Mart, Akers reported the following: that a female had purchased two packages of pseudoephedrine; left the store and met a man in a white Pontiac Bonneville; another man in a brown Oldsmobile exited his car and started talking with the female and man in the Bonneville; and during the conversation, the two men exchanged money. Not only had the detectives received this report, but each detective also had considerable experience in dealing with the sale of methamphetamine precursors, specifically their sale in Independence. In short, the district court did not err by ruling that the detectives had reasonable suspicion to stop Gannon.

### B.    Involuntary Statements and Confession

Gannon also contends that the district court erred by denying his motion to suppress because both his statements and confession were involuntarily made. More specifically, Gannon argues that his statements and confession were involuntary because the detectives threatened to imprison Gannon's ex-wife if he did not confess.

The test for determining the voluntariness of a confession is whether the police extracted the confession by threats, violence, or direct or implied promises, such that the "defendant's will [was] overborne and his capacity for self-determination critically impaired." United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (alteration in original) (internal quotations omitted). In applying this test, we must consider the totality of the circumstances, including law-enforcement officials' conduct and the defendant's capacity to resist pressure. Id.

Gannon's claim that his statements and confession resulted from the detectives' threat that Gannon's ex-wife would be charged is without merit. Below, the district court concluded that no credible evidence suggested that Gannon's statements were involuntary. Specifically, the district court found Gannon's testimony that the officers threatened him incredulous. This was not clear error. And even if we take Gannon's

testimony before the magistrate judge as true, there is no evidence, as the test for involuntariness requires, that Gannon's "will was overborne and his capacity for self-determination critically impaired;" rather, Gannon only testified that his statements were not voluntary because the "detectives repeatedly told [him] that unless he confessed, his wife would be charged." In short, Gannon's involuntary-statements-and-confession argument fails.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Gannon's motion to suppress.

_____