# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2524
_____

United States of America

*Plaintiff - Appellee*

v.

Phillip Anthony Roberts

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: February 13, 2015
Filed: June 4, 2015

_____

Before GRUENDER, SHEPHERD, and KELLY, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Phillip Roberts was indicted for being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1). The district court[1] found Roberts guilty after a bench trial. Roberts appeals his conviction and sentence, and we affirm.

_____

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

## I.

On July 23, 2012, a federal grand jury indicted Phillip Roberts for one count of being a felon in possession of a firearm. Before trial, Roberts moved to suppress a handgun and marijuana that the police recovered from the center console of his car as well as a statement he made to a police sergeant after his arrest. A magistrate judge[2] held a hearing on these motions and heard testimony from Sergeant Bryant Gaden and Officer Chad Degree of the Saint Paul Police Department. The magistrate judge recommended that Roberts's motions be denied, and the district court adopted the magistrate judge's proposed factual findings and rulings. After a bench trial, Roberts was convicted and sentenced to 180 months' imprisonment. *See* 18 U.S.C. § 924(e)(1).

The following facts were established during the pretrial motions hearing and the bench trial. On June 27, 2012, a masked man approached a car and fired a series of shots at the car's three occupants. Two of the car's occupants were struck by the gunfire. Several witnesses saw the crime. While the witnesses' accounts varied as to the shooter's hair and headgear, there was general agreement about the shooter's basic description: a black male about six feet tall and less than two-hundred pounds who was wearing something that covered part of his face. Witnesses also mentioned seeing a black Chrysler quickly leaving the area after the shooting.

A radio transmission alerted nearby officers in the area to be on the lookout for a black Chrysler that may have been involved in a shooting. Moments later, Officer Colleen Lesedi saw a black Chrysler about seven blocks from where the shooting happened. Officer Lesedi stopped the car. She asked the driver, Phillip Roberts, to

---

[2]The Honorable Tony N. Leung, United States Magistrate Judge for the District of Minnesota.

identify himself and then she took pictures of him. Officer Lesedi allowed Roberts to leave after a brief time.

A week later, the police received an anonymous tip that a man named Phillip, who also went by the name "Philco," may have been involved in the shooting. The anonymous tipster provided a photograph of Phillip and his girlfriend. From this information, the police were able to find a booking picture of Roberts that matched the photograph provided by the anonymous tipster. The police also learned from members of the department's gang unit that Roberts went by the name Philco. The police created a photographic lineup that contained Roberts's booking picture and showed the lineup to witnesses. One of those witnesses identified Roberts as the shooter. The witness was able to identify Roberts, despite the fact that the shooter's face had been covered, because the witness knew Roberts from the neighborhood. Based on this evidence, the police issued a notice to arrest Roberts.

On July 11, Officers Chad Degree and Salim Omari recognized Roberts driving a black Chevrolet Tahoe. The officers pulled in front of the Tahoe, cutting off its path and stopping the car, and arrested him. Roberts was the sole occupant of the car. When asked if he had any contraband, Roberts admitted that he had "a little weed." Officer Omari searched Roberts's person and found no contraband. The officers placed Roberts in the back of a police car and conducted an inventory search of the Tahoe where they found marijuana and a handgun in the center console. Roberts was able to see the officers while they conducted the search of the Tahoe as he was facing the Tahoe and seated about eight feet away. The marijuana was visible to the officers inside of two bags within the Tahoe's center console, and the handgun was underneath the marijuana inside of a sock. The front barrel and sight of the handgun were visibly protruding from inside of the sock. The officers also found a work-style glove inside the center console and another similar glove in the rear cargo area. Officer Degree testified that, in his experience, these types of gloves are often recovered alongside

guns and are used to "conceal DNA and fingerprints on firearms." After the arrest, Officer Degree confirmed that the Tahoe was registered to Roberts.

Roberts made several comments while he was in the back of the police car that were recorded by the car's video system. During the inventory search, Roberts said, "[b]ack to the joint, man." Roberts also remarked, "I ain't trying to go back to jail, man," and "[f]ive more years out of my daughter's life." While the officers were driving Roberts to the police station, he said, "If you did find a gun, then you know I ain't going to look for no motherfucker."

Sergeant Gaden interviewed Roberts the next day. Before the interview, Roberts signed a form indicating that he understood his *Miranda* rights. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966). The interview lasted about fifteen minutes and focused on whether Roberts was involved in the June 27 shooting. After Sergeant Gaden finished questioning Roberts, he turned off the tape recorder and prepared to leave. Roberts saw Sergeant Gaden turn off the recorder and at that point, Roberts said something like, "You know how it is out here. I had that gun for protection."

A crime-lab analyst testified that the handgun was recovered loaded with the gun's safety switched to the "fire" position. The crime-lab analyst collected DNA samples from the gun but was unable to recover any fingerprints. Another forensic analyst compared a DNA sample recovered from the handgun with a sample collected from Roberts. This analyst testified that the DNA from the gun was "consistent with being a mixture of DNA from three or more individuals." The analyst concluded that 99.6 percent of the general population could be excluded as contributing to the mixture but that Roberts's DNA was consistent with the 0.4 percent of the population that could have left DNA on the gun.

## II.

## A.

Roberts first argues that the admission he made to Sergeant Gaden as well as the marijuana and the gun should have been suppressed. He contends that Officer Lesedi conducted an unlawful stop when she stopped his car and took pictures of him shortly after the shooting. Roberts also asserts that he was arrested without probable cause. Thus, he argues that the fruits of the unlawful stop and arrest should have been suppressed. For suppression issues, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Lomeli*, 676 F.3d 734, 738 (8th Cir. 2012).

Roberts argues that the investigative stop violated the Fourth Amendment because Officer Lesedi did not have sufficient grounds to justify the stop. Roberts further contends that while no evidence was seized during Officer Lesedi's June 27 stop that was used at trial, information gathered during the stop informed the later decision to arrest Roberts. Thus, according to Roberts, all the evidence later discovered by the police was tainted and should have been suppressed by the district court. *See generally Wong Sun v. United States*, 371 U.S. 471 (1963). Assuming without deciding that the admissibility of the later discovered evidence turns on the legality of the June 27 stop, we hold that Officer Lesedi had reasonable suspicion to stop Roberts and briefly detain him.

A police officer may conduct an investigative stop if she "has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Robinson*, 670 F.3d 874, 876 (8th Cir. 2012) (internal quotation marks omitted) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Reasonable suspicion must be supported by more than a "mere hunch," but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls

considerably short of satisfying the preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (internal quotation marks and citations omitted). "We consider the totality of the circumstances when determining whether an officer has a particularized and objective basis to suspect wrongdoing." *Robinson*, 670 F.3d at 876. This analysis requires us to consider that officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *Arvizu*, 534 U.S. at 273. Situational factors including the "time of day or night" and the "location of the suspect parties" may support the reasonableness of an officer's decision to conduct a stop. *Robinson*, 670 F.3d at 876 (quoting *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995)). "A brief stop of a suspicious individual, in order to determine his identity or maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. 143, 146 (1972).

After the June 27 shooting, witnesses reported seeing a black Chrysler quickly leaving the scene. In response, Saint Paul police sent out a radio transmission to officers in the area stating that a black Chrysler may have been involved in the shooting. Officer Lesedi saw a car matching this description about seven blocks from where the shooting had occurred. Relying on the radio message, Officer Lesedi stopped the car and briefly detained Roberts before allowing him to leave. Roberts concedes that the "traffic stop was conducted on a black Chrysler about seven blocks away from the scene of the crime moments after it occurred." Accordingly, "[w]e focus our analysis on the temporal and geographic proximity of the car to the crime, the matching description of the vehicle, and the time of the stop." *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998). After learning that a black Chrysler may have been involved in a recent shooting merely blocks away, Officer Lesedi was entitled to rely on the radio transmission to briefly detain Roberts. *See United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003) ("[A]n officer may rely on information provided by other officers and all the information known to a team of

officers involved in the investigation to provide justification for a stop."); *Juvenile TK*, 134 F.3d at 900-04 (holding that reasonable suspicion existed for a traffic stop where officers received two dispatch messages within forty-five minutes informing them that a grey car had been involved in criminal activity in the area); *United States v. Witt*, 494 F. App'x 713, 716 (8th Cir. 2012) (unpublished per curiam) (finding reasonable suspicion existed where officers stopped a car "which fit the description of a station wagon" and was traveling away from the scene of a crime).

Roberts notes that, at the time the police issued the radio message, the role that the car played in the shooting was not clear. Roberts further notes that the clothing he was wearing when he was pulled over did not match the description given by some of the witnesses. According to Roberts, these facts demonstrate that Officer Lesedi did not have reasonable suspicion to justify the stop. But this argument is unpersuasive in light of the close temporal and physical proximity of the car to the crime. *See Juvenile TK*, 134 F.3d at 903-04 (relying on the temporal and physical proximity of a description-matching car to a crime to reject an argument that "the vague description of the vehicle and perpetrator . . . coupled with the absence of any observation of illegal activity" meant that a stop lacked reasonable suspicion). It is not surprising that moments after the shooting, the police were unsure of the precise role the black Chrysler may have played. And in light of this brief time frame, it was reasonable for Officer Lesedi to stop a car matching the description of the car that witnesses had seen fleeing the scene of the crime. *See Robinson*, 670 F.3d at 876 (explaining that situational factors such as time and place bear on the reasonableness of an officer's decision to conduct a stop). Thus, we conclude that Officer Lesedi had reasonable suspicion justifying the investigative stop and accordingly hold that the stop did not taint any later discovered evidence.

Roberts next argues that the district court erred by failing to suppress the gun, marijuana, and his later admission because his arrest was not supported by probable cause. Probable cause for an arrest exists "when, considering all the circumstances,

police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime." *United States v. Parish*, 606 F.3d 480, 486 (8th Cir. 2010) (quoting *United States v. Velazquez-Rivera*, 366 F.3d 661, 664 (8th Cir. 2004)). Roberts argues that Officers Degree and Omari lacked probable cause to arrest him because the information that they relied upon came from an uncorroborated and anonymous tip. *See United States v. Woods*, 747 F.3d 552, 557 (8th Cir. 2014) (explaining that "an anonymous tip lacking indicia of reliability does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm"). But here, the anonymous tip was corroborated by independent police investigation. First, witnesses gave a general description of the shooter that matched Roberts. Second, the anonymous tipster used the name "Philco" when referring to Roberts, which police later confirmed was Roberts's alias. Third, and most importantly, an eyewitness identified Roberts as the shooter from a photographic lineup. *See United States v. Lanier*, 636 F.3d 228, 233 (6th Cir. 2011) ("[A]n eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." (quoting *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)). Therefore, we hold that there was probable cause to support Officers Degree and Omari's decision to arrest Roberts and accordingly affirm the district court's denial of Roberts's motions to suppress.

## B.

Roberts next argues that the evidence presented at his trial was insufficient to support his conviction. After a bench trial, we view the evidence "in the light most favorable to the verdict, upholding the verdict if a reasonable factfinder could find the offense proved beyond a reasonable doubt, even if the evidence rationally supports two conflicting hypotheses." *United States v. Huggans*, 650 F.3d 1210, 1222 (8th Cir. 2011) (quoting *United States v. Kain*, 589 F.3d 945, 948 (8th Cir. 2009)). Our review

is *de novo*, and we resolve conflicts in favor of the verdict and accept all reasonable inferences in support of the verdict. *United States v. Acosta*, 619 F.3d 956, 960 (8th Cir. 2010). We will reverse a guilty verdict only if the district court "must have had a reasonable doubt concerning one of the essential elements of the crime." *Huggans*, 650 F.3d at 1222 (quoting *United States v. Hoffman*, 626 F.3d 993, 995 (8th Cir. 2010)).

To convict a defendant under 18 U.S.C. § 922(g)(1), the Government must show that (1) the defendant previously had been convicted of a crime punishable by imprisonment of more than one year, (2) the defendant knowingly possessed a firearm, and (3) the firearm had been in or affected interstate commerce. *United States v. Chatmon*, 742 F.3d 350, 351 (8th Cir. 2014). Here, Roberts only challenges the sufficiency of the evidence as to his knowing possession of the gun. The knowing-possession element is met by showing either actual or constructive possession. *Id.* "Constructive possession requires that the defendant has dominion over the premises where the firearm is located, or control, ownership, or dominion over the firearm itself." *Id.* (quoting *United States v. Garrett*, 648 F.3d 618, 622 (8th Cir. 2011)). The Government may establish constructive possession through circumstantial evidence alone but "must show a sufficient nexus between the defendant and the firearm." *Id.* (quoting *Garrett*, 648 F.3d at 622).

The Government presented extensive evidence supporting the district court's conclusion that Roberts knowingly possessed the handgun. Roberts was driving the Tahoe just before the officers recovered the handgun, and he was the car's only occupant. During his arrest, Roberts admitted that he had marijuana, which was found just above the partially concealed gun. According to a Government witness, Roberts's DNA profile placed him within the 0.4 percent of the general population that could have contributed to a DNA sample found on the gun. Roberts made several incriminating statements while sitting in the back of the police car including his remark: "If you did find a gun, then you know I ain't going to look for no

motherfucker." Finally, Roberts admitted to Sergeant Gaden that he possessed the gun for protection.

Roberts disputes the importance of these facts. For example, Roberts notes that while the Tahoe was registered to him and the handgun was recovered from the Tahoe's center console in close proximity to the marijuana, no evidence showed that Roberts "possessed the firearm on his person, and no fingerprints were recovered." But viewing the evidence in the light most favorable to the verdict, there was more than enough evidence to show that Roberts exercised control, ownership, or dominion over the handgun. In addition to the DNA evidence, incriminating statements, and confession, Roberts was the sole occupant of the car where the gun was found. Our case law has held consistently that "when the sole occupant of a vehicle is found with a gun in the vehicle, this evidence is normally sufficient to uphold the conviction." *United States v. Griffith*, No. 14-1976, --- F.3d ---, 2015 WL 3378290, at *4 (8th Cir. May 26, 2015) (collecting cases). Accordingly, we hold that the Government presented sufficient evidence to support the district court's guilty verdict.[3]

## C.

Finally, Roberts argues that the district court abused its discretion when it refused to grant him a fifth continuance of his sentencing hearing. After Roberts's trial in this case, he filed multiple state petitions for postconviction relief in an effort to have several of his previous convictions removed from his record. Because these

---

[3]In passing, Roberts seems to suggests that our review should not consider certain pieces of evidence that the district court explained were unnecessary to its verdict. However, Roberts does not cite any case law for this proposition. Accordingly, we decline to so limit our review. *See United States v. Roberson*, 439 F.3d 934, 941-42 (8th Cir. 2006) (stating that our sufficiency-of-the-evidence review is based on "all of the evidence").

previous convictions were relevant to his sentence in this case,[4] Roberts requested that the district court continue his sentencing hearing. The district court granted this request four times—delaying sentencing by about a year and a half after the bench trial—before denying Roberts's fifth request.

"District courts have broad discretion when ruling on requests for continuances." *United States v. Jones*, 643 F.3d 275, 277 (8th Cir. 2011). "Continuances generally are not favored and should be granted only when the party requesting one has shown a compelling reason." *Id.* (quoting *United States v. Lakoskey*, 462 F.3d 965, 980 (8th Cir. 2006)). We will affirm a district court's denial of a motion for a continuance unless the court abused its discretion and this abuse resulted in prejudice to the moving party. *Id.* Here, the district court generously granted Roberts four continuances before deciding—after about a year and a half of delays—that a fifth continuance was unwarranted. We conclude that the district court was well within its broad discretion when it denied Roberts's fifth request for a continuance.

## III.

We affirm.

_____

[4]The previous state convictions at issue ultimately served as the basis for an enhanced sentence under the Armed Career Criminal Act. *See* 18 U.S.C. § 924(e)(1).

-11-