# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-2955

_____

United States of America

*Plaintiff - Appellee*

v.

Alberto Anguiano

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: April 17, 2015
Filed: August 3, 2015

_____

Before BYE and SMITH, Circuit Judges, and SCHILTZ,[1] District Judge.

_____

BYE, Circuit Judge.

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota, sitting by designation.

Alberto Anguiano appeals the district court's[2] denial of his motion to suppress evidence found during the search of a vehicle in which Anguiano was a passenger. Anguiano argues (1) the traffic stop was unreasonably prolonged, and (2) the search of the vehicle went beyond the scope of consent provided by the driver. We affirm.

I

On May 7, 2013, Iowa State Patrol Trooper Aaron Taylor was traveling west on Interstate 80 in Dallas County, Iowa, when he observed a 2009 Nissan Rogue with very dark-tinted windows traveling at a speed higher than the posted speed limit. He initiated a traffic stop based on the vehicle's speed and tinted windows.

When he approached the vehicle, Taylor observed three men inside. The men were eventually identified as Juan Gomez (driver), Alberto Anguiano (front seat passenger), and Thomas Lee Boswell (rear seat passenger). Gomez provided Taylor a valid driver's license, vehicle registration, and proof of insurance. Anguiano provided Taylor with an alternate form of Nevada identification. Taylor immediately observed the front dash and center console appeared to be very shiny and clean while the rest of the car appeared messy and "lived in," with food and beverage trash and clothing strewn around the floor and backseat. After testing the window tint and discovering the tint level was in violation of Iowa law, Taylor asked Gomez to come to the patrol car with him.

At 9:01 a.m., Taylor opened his laptop and began to issue warnings to Gomez for the tint and speeding violations. As part of the process, Taylor asked Gomez several questions, such as where he was going and where he had come from. When asked about the identity of the passengers, Gomez explained Anguiano was his uncle

---

[2]The Honorable Stephanie M. Rose, United States District Judge for the Southern District of Iowa.

but he was unsure about the backseat passenger; Gomez thought his name was "Tom," but did not know Tom's last name or anything about him. Gomez said Anguiano and Boswell had arrived at his house that morning and asked him to drive them to Minnesota. When asked who owned the vehicle, Gomez responded that his aunt Paula owned the vehicle, but he could not remember her last name, which Taylor found odd. During the conversation, Taylor observed Gomez to be "extremely nervous," breathing heavily with a rapid pulse, and not looking at Taylor when speaking.

Sometime between 9:08 and 9:11 a.m., Taylor ran a registration, license, and criminal history check on all three men. It took dispatch approximately fifteen minutes to respond. While he was waiting for the information, Taylor asked Anguiano to speak with him in the patrol car while Gomez waited outside. He asked Anguiano similar questions as Gomez. Anguiano said it was his "good friend . . . Mario's car but it was registered to the mom . . . Pamela." However, he could not give a last name for either Mario or Pamela, though he later told Taylor the registered owner was "Paolo." About fifteen minutes into the conversation, dispatch informed Taylor that there was an outstanding arrest warrant for Anguiano, that he was "known to be armed and dangerous," and that "extreme caution" should be used when taking him into custody. At that point, Taylor decided to wait for backup before arresting Anguiano. While waiting, Taylor continued to ask questions of Anguiano. Anguiano explained that he came to Nebraska from Las Vegas with someone named "Carlos," but he did not know anything about Carlos, such as why he was in Las Vegas. Anguiano further explained that the three men were heading to St. Paul to look for a truck which had been taken from Boswell by someone named "Cody Hopkins." Anguiano said they knew Hopkins liked to drink, so they planned to look for him in bars. They did not have an address or know where to find him. Like Gomez, Anguiano appeared "extremely nervous," had a high pulse, was breathing hard, and avoided eye contact. At approximately 9:29 a.m., another trooper arrived and placed Anguiano under arrest. The second trooper had other business to conduct, so at

approximately 9:37 a.m., a third trooper arrived and Anguiano was transferred to that trooper's patrol car.

After Anguiano's arrest, Taylor spoke with Boswell. Boswell provided they were traveling to Minnesota, though he was not sure which city, to look for John Hopkins. When asked about the other passengers in the car, Boswell stated he believed the driver's name (Juan Gomez) was Alberto but did not know his last name. He also stated the other passenger was Albert and that he had known him since the seventh grade, but could not provide his last name.

At approximately 9:41 a.m., Taylor issued Gomez written warnings for the tint and speeding violation and gave Gomez his information back. Taylor told Gomez he was done with the traffic stop but as Gomez opened the door to the patrol car and stepped out, Taylor asked Gomez if he could ask him a couple more questions. Gomez agreed and sat back in the patrol car. Taylor confronted Gomez about several inconsistencies in his story and told him he believed there was "criminal activity taking place." He then asked Gomez for consent to search the vehicle. Gomez explained it was not his vehicle but stated he did not care if Taylor searched the vehicle. After Taylor explained that Gomez could consent even though he was not the owner, Gomez gave verbal and written consent to search the vehicle. Taylor told Gomez he would "search all contents of the vehicle, which includes everything."

At approximately 9:50 a.m., Taylor and the other trooper began to search the vehicle. In the rear hatch of the vehicle, they found a Coffee-Mate can with a false bottom, which contained green leafy pieces that appeared to be, and smelled like, marijuana. The troopers also found a rifle bag containing a rifle and ammunition, which, after a serial number search, they discovered was stolen. In addition, they found a meth pipe and an open six-pack of beer in the backseat. During the search, the troopers also removed the panel in the center console area because it is "a common place people that are smuggling drugs will hide contraband or other items."

-4-

Behind the panel, the troopers found a black bag containing two pounds of methamphetamine. No damage was done to the vehicle while removing the panel, and Taylor testified it took about two seconds to remove and replace the panel.

The government filed an indictment against all three men, charging them with possession with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Anguiano filed two motions to suppress, arguing Taylor unreasonably prolonged the traffic stop, Gomez lacked authority to consent to the search, and the search of the vehicle went beyond the scope of consent provided by Gomez. The district court denied both motions, finding the traffic stop was reasonable, any extension of the stop was supported by reasonable suspicion, Anguiano lacked standing to challenge the search of the vehicle, and in any event, the search was supported by consent and probable cause. Anguiano then entered a conditional guilty plea, reserving his right to appeal the denial of his motion to suppress and withdraw his guilty plea should the district court's denial be reversed. The district court then sentenced Anguiano to 120 months' imprisonment.

II

When reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo*. United States v. Suitt, 569 F.3d 867, 870 (8th Cir. 2009).

On appeal, Anguiano argues (1) Taylor unreasonably prolonged the traffic stop, and (2) the search of the vehicle went beyond the scope of consent provided by Gomez.[3] We address each issue in turn.

_____

[3]Anguiano's brief also makes reference to, but then fails to provide argument or authority for, a third argument that Gomez was not authorized to provide consent to search the Nissan. His fleeting reference is insufficient to preserve the argument,

A

Anguiano argues Taylor unreasonably prolonged the traffic stop because he extended it beyond a time reasonably required to complete the purpose of the stop.[4] We have consistently held that during a lawful traffic stop, a police officer may conduct an investigation reasonably related in scope to the circumstances that justified the stop. United States v. Barragan, 379 F.3d 524, 528 (8th Cir. 2004). This includes undertaking a number of routine tasks such as a check of the vehicle's registration and the driver's license and criminal history. Id. at 528-29. The officer may also question the car's occupants about their destination and itinerary. United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002). There is no per se time limit on all traffic stops, and complications in carrying out the traffic-related purposes of the stop may justify a longer detention than when a stop is strictly routine. United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007). Furthermore, if the investigating officer discovers information leading to reasonable suspicion, he may justifiably extend the stop. United States v. Quintero-Felix, 714 F.3d 563, 567 (8th Cir. 2013).

Anguiano does not seem to challenge the duration of the stop prior to his arrest at approximately 9:29 a.m., which included the initial questioning of Gomez and Anguiano.[5] Rather, Anguiano asserts that at the time of his arrest, "Taylor had

_____

and therefore it is waived. See United States v. Zavala, 427 F.3d 562, 564 n.1 (8th Cir. 2005).

[4]Anguiano does not challenge the basis for the traffic stop.

[5]Even if he did, we would find no merit in the argument, since at that point Taylor had not completed the purposes of the stop or his routine investigation. In addition, considering dispatch's report that Anguiano had an outstanding warrant for his arrest, he was "known to be armed and dangerous," and that "extreme caution" should be used when taking him into custody, Taylor's relatively brief wait for

-6-

received all information" and unlawfully prolonged the stop after his arrest by continuing to ask questions of Boswell. Assuming without deciding that Anguiano has standing to challenge the stop after his arrest, and taking into account the totality of the circumstances and Taylor's experience and knowledge of drug trafficking, we find the extension of the traffic stop was justified by reasonable suspicion of criminal activity. See United States v. Woods, 747 F.3d 552, 555-56 (8th Cir. 2014).

First, Taylor's suspicions were immediately aroused by the vehicle's appearance upon his initial interaction with the occupants. Taylor noted that the vehicle's interior exhibited some indications consistent with drug trafficking. For instance, Taylor noticed that the vehicle's dash and center console were shiny and clean, while the rest of the vehicle appeared messy and "lived-in," with trash and clothing strewn around the floor and backseat. Second, Gomez and Anguiano were visibly "extremely nervous" throughout the encounter, exhibiting high pulse rates and heavy breathing, and avoiding eye contact with Taylor, all of which can contribute to a finding of reasonable suspicion. See United States v. Riley, 684 F.3d 758, 763-64 (8th Cir. 2012). Finally, and most importantly, Gomez and Anguiano provided inconsistent stories and were unable to answer simple questions. For example, the two men provided differing answers as to the owner of the car. Gomez stated it was his aunt Paula, while Anguiano stated it belonged to his "good friend Mario," but was registered to Mario's mother, Pamela. Gomez was unsure about Boswell's identity; while he believed his name was Tom, he knew nothing else about him, including his last name. Odder still, Gomez did not know his own aunt's last name. Gomez was also unsure about the trio's destination (he "thought it was St. Paul"). Similarly, Anguiano did not know the last name of either his "good friend Mario" or Mario's mother. In addition, Anguiano's story about the purpose of the trip—to randomly

---

back-up to assist in Anguiano's arrest was a sufficient reason to justify a longer detention than would be necessary in a routine situation. See United States. v. Luginbyhl, 321 F. App'x 780, 786-87 (10th Cir. 2009).

look in bars for a man they knew almost nothing about other than he liked to drink—was nothing short of incredible.

The first two passengers' accounts led Taylor to question Boswell for additional information. What Taylor learned from Boswell continued to support reasonable suspicion of criminal activity. Boswell did not know the name of the vehicle's driver (Gomez), identified Anguiano as "Albert," but did not know his last name—despite claiming he had known Anguiano since seventh grade—was unsure of the city to which they were traveling, and gave a different first name for the alleged truck thief (John, rather than Cody, Hopkins). While Anguiano attempts to highlight some of the consistencies in the men's stories, any general consistency cannot serve to dispel the contradictions of basic details, such as the name of the car's owner and the person for whom they were looking. In combination with the half-cleaned vehicle and extremely nervous behavior from all passengers, we hold that Taylor had reasonable suspicion that criminal activity was afoot, and therefore, was justified in extending the traffic stop.[6]

B

Anguiano next argues the search of the vehicle went beyond the scope of Gomez's consent. Anguiano acknowledges Gomez gave consent for police to search the vehicle, but he argues the consent did not include searching the center console panel where methamphetamine was ultimately found. We need not reach this

---

[6]Anguiano does not squarely challenge the questioning of Gomez after he was told he was free to leave and began to exit the patrol car. To the extent Anguiano does, we do not believe the district court erred in finding the extension consensual. See Quintero-Felix, 714 F.3d at 568 (holding that an officer could have reasonably believed the suspect consented to the extension of the stop when the officer told him he was free to leave, he opened the door to exit, but remained in the vehicle and continued answering the officer's questions).

-8-

argument, however, because Anguiano failed to demonstrate he had a reasonable expectation of privacy in the vehicle as a mere passenger.[7]

We review the district court's factual determinations for clear error, and the defendant's standing to challenge the search *de novo*. United States v. Muhammed, 58 F.3d 353, 355 (8th Cir. 1995). It is well-established that "Fourth Amendment rights are personal rights that may not be asserted vicariously." Barragan, 379 F.3d at 529. "An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" Id. (quoting Minnesota v. Carter, 525 U.S. 83, 88 (1998)). A defendant who "fails to prove a sufficiently close connection to the relevant places or objects searched [] has no standing to claim that they were searched . . . illegally." United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994). "Factors relevant to the determination of standing include" the following:

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

Id.

Here, there is not a great deal of information in the record about Anguiano's connection to the vehicle, and the evidence that exists does not support his case. Anguiano was not an owner, registered user, or driver of the vehicle when it was stopped; rather, he was merely a passenger. Generally, a mere passenger does not

---

[7]Although the district court expressly held Anguiano lacked standing to challenge the search, Anguiano did not meaningfully address the issue on appeal.

have standing to challenge a vehicle search where he has "neither a property nor a possessory interest in the automobile." Rakas v. Illinois, 439 U.S. 128, 148 (1978).

Anguiano's main assertion for a reasonable expectation of privacy in the vehicle appears to be based on his limited use and control of the vehicle; specifically, his "custody and control" of the vehicle when it was his "mode of transportation from Las Vegas to the point of the stop." We find this argument unpersuasive. First, there is no evidence Anguiano ever drove the vehicle, and in fact, he lacked a valid driver's license. The mere fact he may have previously been a passenger is insufficient. See United States v. Marquez, 605 F.3d 604, 609 (8th Cir. 2010). Second, even if Anguiano had driven the vehicle himself at some point, he provided no evidence of consent or permission from the vehicle's lawful owner. See Muhammed, 58 F.3d at 354 (holding defendant needed to make some affirmative showing of consensual possession to satisfy the standing requirements). Indeed, Anguiano did not even know who the vehicle's owner was. Finally, the mere duration and distance of his trip alone is insufficient to elevate Anguiano's status beyond a mere passenger without a reasonable expectation of privacy. See United States v. Symonevich, 688 F.3d 12, 20-21 (1st Cir. 2012) ("[W]ithout categorically rejecting the relevance of the duration of a trip in an automobile to the reasonable expectation of privacy analysis, we conclude that the duration of the trip here [(six hours)] . . . did nothing to enhance Symonevich's expectation of privacy."); see also United States v. Jefferson, 925 F.2d 1242, 1249-51 (10th Cir. 1991) (holding passenger in vehicle lacked standing to challenge the car search even though he shared driving responsibilities during a long-distance trip and explaining the "Supreme Court [did not] intend[] that any time an accused takes a long distance road trip in a car, the car is to be treated like a home for Fourth Amendment purposes").

Therefore, we hold Anguiano failed to demonstrate a sufficiently close connection to the vehicle to establish standing to challenge the search.

-10-

## III

For the foregoing reasons, the district court's order is affirmed.

_____