# United States Court of Appeals
### For the Eighth Circuit

_____

No. 16-4097

_____

United States of America

*Plaintiff - Appellee*

v.

Nicolas Cobo-Cobo

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: September 22, 2017
Filed: October 12, 2017

_____

Before LOKEN, ARNOLD, and SHEPHERD, Circuit Judges.

_____

ARNOLD, Circuit Judge.

After Nicolas Cobo-Cobo was indicted for misusing a social security number, *see* 42 U.S.C. § 408(a)(7)(B), he moved to suppress evidence obtained during a police encounter that occurred more than four years before. The district court,[1] adopting the

_____

[1]The Honorable Linda R. Reade, then Chief Judge, United States District Court for the Northern District of Iowa.

report and recommendation of the magistrate judge,[2] denied the motion. Cobo-Cobo pleaded guilty but reserved his right to appeal the district court's denial of his motion to suppress. He now appeals that ruling, and we affirm.

Special Agents Michael Fischels and Andrew Lund with the Department of Homeland Security were helping a local police department investigate a stabbing incident when one Elias Mendoza-Marcos piqued their interest. According to Fischels, they followed Mendoza-Marcos to a laundromat and, once he got out of his car, Fischels told him that they were investigating a stabbing and began questioning him. Though it became apparent that Mendoza-Marcos was not involved in the stabbing, the agents began to suspect that Mendoza-Marcos might be in the country illegally when he could not furnish a government-issued form of identification. Mendoza-Marcos told the agents that he lived in an apartment in the building containing the laundromat and acknowledged that other people lived with him. He also admitted that he was from Guatemala and that he had no documentation authorizing him to live in the United States.

The agents then arrested Mendoza-Marcos and asked him if he wanted to retrieve any items from his apartment to take with him to the immigration office. He said he did, and, according to both agents, consented to their entering the apartment with him. On their approach to the apartment, one of Mendoza-Marcos's roommates spoke with him through a window on the second floor. According to Lund, the roommate then opened the apartment door and did not object when the agents entered with Mendoza-Marcos. The agents asked Mendoza-Marcos and the roommate to round up others who were in the apartment, and, when they said that Cobo-Cobo was asleep in a bedroom, the agents requested that they wake him and gather everyone in the living room to speak with the agents. Like Mendoza-Marcos, the other occupants

[2]The Honorable Jon Stuart Scoles, then Chief Magistrate Judge, United States District Court for the Northern District of Iowa, now retired.

could not provide government-issued identifications, and, after questioning confirmed that they too were in the country illegally, the agents arrested them. It is important for present purposes that, as a result of this incident, the government obtained Cobo-Cobo's employment identification card from a business called Carlson Building Maintenance and placed it in Cobo-Cobo's "alien file"—a government file that, according to one witness, contains papers and documents pertaining to a person's immigration status.

The identification card resurfaced a little more than four years later after a deportation officer reviewed Cobo-Cobo's alien file. The officer contacted Carlson to request a copy of Cobo-Cobo's I–9 Employment Eligibility Verification Form, and Carlson obliged. Federal law requires employers to verify the identity of their employees by checking certain documents to ensure they are eligible to work in the United States, which the employer, in an I–9 form, must attest to having done. *See Split Rail Fence Co., Inc. v. United States*, 852 F.3d 1228, 1232 (10th Cir. 2017). While reviewing Cobo-Cobo's I–9 form, the deportation officer discovered that Cobo-Cobo had provided Carlson with a social security number that did not belong to him, leading to the indictment here.

Cobo-Cobo asserts that the agents violated the Fourth Amendment by entering his apartment without permission, and so the district court should have suppressed the evidence obtained there. Though police officers generally need a warrant to enter a home to search or make an arrest, they do not need one when someone possessing common authority over the home voluntarily consents to their entry. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Cobo-Cobo relies on Mendoza-Marcos's testimony that he never gave the agents consent to enter the apartment, whereas the government relies on the agents' testimony to the contrary. When reviewing the denial of a motion to suppress, we review factual findings for clear error. *United States v. Wolff*, 830 F.3d 755, 758 (8th Cir. 2016).

The district court found that Mendoza-Marcos had indeed consented to the agents' entry into the apartment, and it gave several cogent reasons for doing so. For example, since the district court had found that Mendoza-Marcos was placed under arrest outside the apartment, it thought it reasonable to believe that the agents would not allow Mendoza-Marcos to enter the apartment unaccompanied, and so it was in turn reasonable to think that the agents would ask for permission to enter the apartment with him. Similarly, the district court refused to credit Mendoza-Marcos's testimony that the officers did not identify themselves, ask him where he lived, or ask him if he lived alone, given that he had allowed the agents to arrest him and accompany him into the apartment. The district court also found that Mendoza-Marcos's conversation with the roommate in the window did not fit with his testimony that the agents "just went in" to the apartment. The district court's choice between two permissible views of the evidence cannot be considered clearly erroneous, so we are not left with a "definite and firm conviction" that the district court made a mistake here, *see Lockhart v. United States*, 834 F.3d 952, 957 (8th Cir. 2016), especially since a finding on witness credibility is virtually unassailable on appeal. *Wolff*, 830 F.3d at 759.

Cobo-Cobo also argues that, even if Mendoza-Marcos consented to the agents' entry, he did not do so voluntarily since he was under arrest, was not advised of his right to refuse consent, had not received *Miranda* warnings, and had no prior experience with law enforcement officials. We review a determination of whether consent was voluntary for clear error. *United States v. Comstock*, 531 F.3d 667, 676 (8th Cir. 2008). None of the facts that Cobo-Cobo emphasizes automatically renders consent involuntary. Officers need not provide *Miranda* warnings before requesting consent to perform a search, *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007), or inform arrestees of their right to refuse consent. *United States v. Ortega-Montalvo*, 850 F.3d 429, 435 (8th Cir. 2017). While these omissions can influence a finding of whether consent was voluntary, we see no clear error with the finding that Mendoza-Marcos voluntarily consented here. The district court found that he had

-4-

at least average intelligence and that nothing suggested that he was intoxicated or otherwise without his faculties during the police encounter. The agents confronted Mendoza-Marcos in a public place and did not display their weapons, raise their voices, place restraints on him, or make promises to him before receiving his consent. We have affirmed findings of voluntary consent in similar circumstances. *See, e.g.*, *Comstock*, 531 F.3d at 677–78. Because we conclude that the district court did not clearly err in finding that Mendoza-Marcos's consent was voluntary, we need not determine whether the agents also had authority to accompany him into the apartment to ensure their own safety and to protect the integrity of the arrest. *See United States v. Varner*, 481 F.3d 569, 571–72 (8th Cir. 2007).

We next consider whether the agents had reasonable suspicion to seize Cobo-Cobo by adjuring him to sit in the living room for questioning. We review reasonable-suspicion determinations de novo. *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016). The agents could seize Cobo-Cobo if they had a reasonable, articulable suspicion that criminal activity was afoot; reasonable suspicion is more than a mere hunch but less than probable cause or a preponderance of the evidence. *United States v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015). We consider all the relevant circumstances, keeping in mind that officers may draw on their experience and training to make inferences from the information they have. *Id.*

Cobo-Cobo maintains that the agents' suspicion that he was in the country illegally was based solely on his Hispanic heritage, and points out that a person's heritage alone cannot give rise to a reasonable suspicion that he is in the United States illegally. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 886–87 (1975). But his assertion mischaracterizes the record. The district court determined, on a sufficient record, that the agents' suspicion was based on a number of considerations in addition to Cobo-Cobo's heritage. For instance, the court found that the agents, based on their experience, suspected Cobo-Cobo was in the country illegally because it was common for unrelated illegal-alien males to live together, and that when they

seized Cobo-Cobo they had already arrested one of his unrelated male roommates for being an illegal alien. The court also credited the agents' testimony that none of the men spoke English, a circumstance that indicated that they had not been in the country for long. In addition, Lund testified that he had been to the same apartment several times and knew that the landlord rented to undocumented aliens. It is inconsequential that one or both of the agents also considered Cobo-Cobo's heritage in seizing him since *Brignoni-Ponce* expressly recognizes that heritage may be a "relevant factor," among others, in forming a reasonable suspicion. *See id.*; *see also United States v. Garcia*, 23 F.3d 1331, 1335 (8th Cir. 1994). We therefore reject this contention.

Cobo-Cobo also emphasizes that his "mere propinquity to others independently suspected of criminal activity" did not provide reasonable suspicion to seize him. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). *Ybarra* is clearly distinguishable. There, the Supreme Court held that the Fourth Amendment protected a bar patron whose proximity to a bartender for whom there was probable cause to search was the only evidence of the patron's criminal activity. *Id.* at 90–91, 96. But as we have already indicated, other facts besides Cobo-Cobo's propinquity to Mendoza-Marcos support a conclusion that the agents had reasonable suspicion to seize Cobo-Cobo. And even assuming *Ybarra* applies in the reasonable-suspicion context, in addition to the probable-cause context in which it arose, Cobo-Cobo was not merely near Mendoza-Marcos; he lived with him. *See United States v. Cowan*, 674 F.3d 947, 954 (8th Cir. 2012). Since we conclude that the agents had reasonable suspicion, we decline to decide whether the deportation officer would have inevitably discovered Cobo-Cobo's misuse of the social security number without the help of the identification card in Cobo-Cobo's alien file.

Affirmed.

_____