# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-4379

_____

United States of America

*Plaintiff - Appellee*

v.

Stanley Earl Mosley, Jr.

*Defendant - Appellant*

_____

No. 16-4424

_____

United States of America

*Plaintiff - Appellee*

v.

Katherine Amanda Pihl

*Defendant - Appellant*

_____

No. 16-4489

_____

United States of America

*Plaintiff - Appellee*

v.

Lance Lapae Monden

*Defendant - Appellant*

————————

Appeals from United States District Court
for the Northern District of Iowa - Cedar Rapids

————————

Submitted: September 21, 2017
Filed: December 21, 2017

————————

Before SMITH, Chief Judge, WOLLMAN and GRUENDER, Circuit Judges.

————————

GRUENDER, Circuit Judge.

Stanley Mosley, Katherine Pihl, and Lance Monden appeal the district court's[1] denial of their motions to suppress. Mosley also appeals the district court's determination that he qualifies as a career offender under the United States Sentencing Guidelines ("U.S.S.G."). For the reasons that follow, we affirm.

————————

[1]The Honorable Leonard T. Strand, Chief Judge, United States District Court for the Northern District of Iowa, adopting the report and recommendations of the Honorable Jon Stuart Scoles, United States Magistrate Judge for the Northern District of Iowa, now retired.

# I.

On May 20, 2016, at approximately 2:35 p.m., two individuals robbed a bank in Palo, Iowa. The robbers were in the bank for about a minute. As the robbers were leaving the bank, four individuals in a truck driving by saw the robbers flee across the grass but eventually lost sight of them. As the truck circled around the block attempting to spot the robbers again, one of the individuals in the truck ("the witness") called the bank. After the bank received the call from the witness, a bank employee called 911 and began relaying information about the robbery, including information the employee was getting from the witness on the other line. Though the witness could not locate the robbers he initially saw running from the bank, he reported that a gray/silver Ford Taurus was in the vicinity of the bank and was the only vehicle leaving the area in the moments after the robbery. The witness followed the Taurus and gave its location and direction of travel to the bank employee, who continued to relay the information to 911 dispatch. When the witness got close enough to see inside the gray Taurus, he reported that he could only see one woman in the car, whereas he had seen two men running from the bank. At this point, the witness indicated that he was no longer sure if the gray Taurus was involved in the bank robbery.

Around 2:40 p.m., Deputy Uher received a radio dispatch that a gray Ford Taurus may have been involved in a bank robbery and was seen heading southbound on Highway 94 toward Cedar Rapids. A few minutes later, he identified a vehicle matching the color, make, and model given in the description, and the vehicle was traveling in the direction indicated by the witness. At about 2:44 p.m., Deputy Uher initiated a stop of the Taurus approximately 5.8 miles from the bank and approximately eight minutes after the robbery took place.

Deputy Uher ran the Taurus's license plate number and determined that the car was registered to Farrah Franklin. As Deputy Uher prepared to approach the driver,

dispatch reported that the witness was not sure if the Taurus was involved in the robbery. Deputy Uher spoke with the driver, Katherine Pihl, but did not see anyone else inside the car. Deputy Uher then told Pihl she could leave, but before she could, another officer suggested via radio that Deputy Uher obtain more information from Pihl. At about 2:47 p.m., dispatch informed Deputy Uher that they had spoken directly to the witness and that he indicated he did not actually see the two robbers get in the gray Taurus. Deputy Uher then told dispatch that he was going to let Pihl go. Another deputy suggested that Deputy Uher check the trunk. At approximately 2:48 p.m., Pihl opened the trunk. Inside and about four minutes after Deputy Uher initiated the stop, officers found Monden and Mosley, along with cash and masks. Pihl, Monden, and Mosley were arrested.

Pihl, Monden, and Mosley were indicted for bank robbery in violation of 18 U.S.C. § 2113(a). All three filed motions to suppress evidence under the Fourth Amendment. The magistrate judge filed a report and recommendation concluding that the district court should deny the motions to suppress. Thereafter, Pihl, Monden, and Mosley pleaded guilty, reserving their rights to appeal the denial of the suppression motions. *See* Fed. R. Crim. P. 11(a)(2). The district court accepted the report and recommendation and denied the motions to suppress. At sentencing, the district court found that Mosley qualified for a career offender enhancement but varied downward after calculating his guidelines range. On appeal, Pihl, Monden, and Mosley challenge the denial of their suppression motions, and Mosley challenges his sentence, claiming that he does not qualify as a career offender.

## II.

"We review the denial of a motion to suppress *de novo* but the underlying factual determinations for clear error, giving due weight to inferences drawn by law enforcement officials." *United States v. Hurd*, 785 F.3d 311, 314 (8th Cir. 2015). In

their motions to suppress, the appellants challenged the legality of the stop, the duration of the stop, and the search of the trunk. We address each issue in turn.

## A.

"The Fourth Amendment permits investigative traffic stops when law enforcement has reasonable suspicion of criminal activity." *United States v. Tamayo-Baez*, 820 F.3d 308, 312 (8th Cir. 2016) (citing *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014)). Reasonable suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 134 S. Ct. at 1687 (internal quotation marks omitted). "Reasonable suspicion exists when an officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (internal quotation marks omitted). Though an "inchoate hunch" does not equate to reasonable suspicion, "the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *Tamayo-Baez*, 820 F.3d at 312. We assess whether a law enforcement official had reasonable suspicion of criminal activity based on the totality of the circumstances. *Id*.

The appellants claim that the district court erred in two ways when finding that the vehicle stop was supported by reasonable suspicion. First, they assert that because the police officers in this case were unsure whether the gray Taurus was involved in the bank robbery, they lacked reasonable suspicion to stop a vehicle matching that description. Second, the appellants argue that the tip from the witness was unreliable and therefore insufficient to create reasonable suspicion of criminal activity. Both contentions are inconsistent with controlling precedent.

First, the appellants rely on the Fifth Circuit's decision in *United States v. Jaquez*, 421 F.3d 338 (5th Cir. 2005) (per curiam), to support the idea that law

enforcement lacked sufficient specific information to support reasonable suspicion because the witness was not able to state "concretely" that the Ford Taurus was involved in the bank robbery. In *Jaquez*, the Fifth Circuit found that an officer who received a call from dispatch regarding an incident involving "shots fired" and a "red vehicle" lacked reasonable suspicion to stop a red vehicle leaving the area fifteen minutes later. *Id.* at 340-41. The court explained that the "sparse and broadly generic information provided by the dispatcher, without more, was insufficient to support a determination of reasonable suspicion." *Id.* at 341.

The facts in *Jaquez* are readily distinguishable from this case, but, more importantly, our own precedent rejects any requirement that there must be a definite or certain connection to the criminal activity to support reasonable suspicion. In *United States v. Roberts*, a masked gunman fired shots at three people, and witnesses saw a black Chrysler quickly leaving the area after the shooting. 787 F.3d 1204, 1207 (8th Cir. 2015). An officer saw a black Chrysler about seven blocks from the location of the shooting and stopped the vehicle. *Id.* The defendant in that case argued that at the time of the stop, it was unclear what role the black Chrysler played in the shooting. *Id.* at 1210. The defendant also claimed that "the clothing he was wearing when he was pulled over did not match the descriptions given by some of the witnesses." *Id.* Accordingly, he argued that the stop was unlawful because the officer lacked reasonable suspicion to believe he was involved in criminal activity. *Id.* We disagreed, noting that "[i]t is not surprising that moments after the shooting, the police were unsure of the precise role the black Chrysler may have played. And in light of this brief time frame, it was reasonable for [the officer] to stop a car matching the description of the car that witnesses had seen fleeing the scene of the crime." *Id.* We took special note of "the close temporal and physical proximity of the car to the crime" and ultimately concluded that the officer had reasonable suspicion justifying the investigative stop. *Id.* (citing *United States v. Juvenile TK*, 134 F.3d 899, 903-04 (8th Cir. 1998)).

-6-

Just as in *Roberts*, the police in this case "were unsure of the precise role the [gray Taurus] may have played." *See id.* However, the gray Taurus was the only vehicle that the witness saw leaving the area shortly after spotting two hooded men flee from the bank. Deputy Uher then identified the vehicle in close geographic and temporal proximity to the robbery, traveling in the direction and on the road provided by the witness. While the driver of the Taurus did not match the description of the two men fleeing the scene of the bank robbery, the defendant in *Roberts* also did not match exactly the descriptions given by witnesses. *See id.*; *cf. Navarette*, 134 S. Ct. at 1691 ("[W]e have consistently recognized that reasonable suspicion need not rule out the possibility of innocent conduct." (internal quotation marks omitted)). Thus, based on these factors and "the close temporal and physical proximity of the [gray Taurus] to the crime," the totality of the circumstances indicates that reasonable suspicion supported the vehicle stop and rendered it constitutional. *See Roberts*, 787 F.3d at 1210.

Second, the appellants argue that Deputy Uher lacked reasonable suspicion to stop the Taurus because the tip from the witness was unreliable. The appellants claim that even though the witness's name and telephone number were known, nothing else was known about this individual. They argue that law enforcement had no information regarding the witness's veracity and did not receive the information from the witness directly but from a third party who was on the phone with both the witness and the police.

The Supreme Court's analysis in *Navarette v. California*, however, suggests that the witness's tip was reliable and provided reasonable suspicion to make the stop. When evaluating tips, reasonable suspicion "is dependent upon both the content of the information possessed by the police and its degree of reliability." *Navarette*, 134 S. Ct. at 1687. In *Navarette*, a law enforcement dispatch team received a call from another dispatcher in a neighboring county relaying a tip from a 911 caller. *Id.* at 1686. The tipster reported that another car ran her off the highway five minutes

earlier and gave a description of the vehicle and its license plate number. *Id.* at 1686-87. In finding that the officer's reliance on the tip was justified, the Supreme Court emphasized the "eyewitness knowledge of the alleged dangerous driving," the "contemporaneous report[ing]" of the incident, and the ability to hold the tipster accountable for potentially false reports. *Id.* at 1689-90.

Here, the very same factors—eyewitness knowledge, contemporaneous reporting, and accountability—weigh in favor of the witness's reliability. The witness claimed eyewitness knowledge of the facts at hand and was able to predict the Taurus's direction of travel. Moreover, the witness reported his observations nearly "contemporaneous[ly]"—he called the bank within five minutes of the robbery, and a bank employee promptly began relaying information to a 911 operator. Finally, because the witness's name and telephone number were known, he could be held accountable for false reporting. As a result, based on *Navarette*, we find that the witness's tip that Deputy Uher relied upon was reliable. Therefore, the district court properly concluded that the stop was supported by reasonable suspicion under the totality of the circumstances.

### B.

We next consider whether the stop of the Taurus was prolonged unconstitutionally after Deputy Uher's initial conversation with Pihl. "The Fourth Amendment requires that a search not continue longer than necessary to effectuate the purposes of an investigative stop." *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993). "[A]n investigative stop must cease once reasonable suspicion or probable cause dissipates." *Id.* The appellants argue that law enforcement unlawfully extended the stop after they obtained Pihl's information and determined that she was alone in the cab of the car, contrary to the witness's tip reporting two male suspects.

In *Rodriguez v. United States*, the Supreme Court held that "the tolerable duration of police inquires in the traffic-stop context is determined by the seizure's

'mission.'" 135 S. Ct. 1609, 1614 (2015). In other words, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures," *id.* at 1612, because a "seizure remains lawful only so long as [unrelated] inquires do not measurably extend the duration of the stop," *id.* at 1615 (internal quotation marks omitted) (alteration in original). When conducting a *traffic* stop, the "mission" of stopping the vehicle is to address a traffic violation and related safety concerns. Applying this logic, the Supreme Court concluded that law enforcement cannot unlawfully extend a traffic stop to allow a drug-sniffing dog to check for narcotics after the traffic violation has already been addressed. *Id.* at 1614-15, 1616-17 (remanding to determine "whether reasonable suspicion of criminal activity justified detaining [the defendant] beyond the completion of the traffic infraction investigation").

Appellants rely on the Second Circuit's application of *Rodriguez* and suggest that the scope of law enforcement's mission in this case was limited to determining whether the occupants of the vehicle matched the description of the suspected bank robbers. *See United States v. Watson*, 787 F.3d 101, 102-05 (2d Cir. 2015) (finding that an officer, while looking for a single known suspect, unconstitutionally searched an individual that the officer knew was not the targeted suspect). Here, however, the mission of the stop was not to investigate a traffic violation or identify a match to a known suspect but rather to determine whether and to what extent the Taurus was involved in the bank robbery. Law enforcement worked diligently in pursuit of this mission.

Nonetheless, the appellants argue that the stop was unlawfully extended. In particular, they contend that any reasonable suspicion based on the witness's tip dissipated when Deputy Uher obtained Pihl's information and determined that she was alone in the passenger compartment of the car, in contradiction to the witness's tip reporting two men fleeing the scene of the bank robbery. Furthermore, the appellants point out that "[n]othing about Deputy Uher's interactions with Pihl

indicated to him that the Ford Taurus was involved." At that point, the appellants claim, reasonable suspicion no longer existed and further investigation unlawfully extended the stop.

But reasonable suspicion did not dissolve simply because Pihl did not match the description given by the witness or because Deputy Uher's initial investigation did not bolster his original suspicion. Discrepancies between the information provided in the tip and the facts on the ground—even inconsistencies as to the number of occupants in a vehicle—do not alone undermine reasonable suspicion, especially where there are other factors corroborating the tip and reasonable explanations for the discrepancies. *See, e.g.*, *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) ("The presence of three persons in the car, rather than two, is a discrepancy that might reasonably be explained in any number of ways and does not defeat the assessment that [the officer] had reasonable grounds to investigate further."). As the Government noted in its brief, bank robbers often use getaway drivers, so when investigating whether a vehicle was involved in such a robbery, "law enforcement's mission could include determining if the driver is the getaway driver, even if she does not meet the description of the men who went into the bank." Furthermore, it is foreseeable that bank robbers using getaway drivers would conceal themselves in the vehicle's trunk.

Appellants argue, however, that Deputy Uher in fact lacked the requisite suspicion to continue the stop. Indeed, he was twice prepared to let Pihl leave. Still, their argument ignores the collective knowledge doctrine: "collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008); *see also* *United States v. Williams*, 429 F.3d 767, 771-72 (8th Cir. 2005) (finding that the collective knowledge doctrine allowed knowledge of other officers to be imputed to

an officer who received a radio request to stop the vehicle). Perhaps with this in mind, the appellants suggest that Deputy Uher "waited to obtain input from other deputies on the radio" and that "waiting for input from officers who aren't even at the scene is not expeditious." We disagree. The entire stop took only four minutes and was not unconstitutionally extended by Deputy Uher conferring with other officers via radio. Indeed, the officers' communication was immediate and did not "measurably extend the duration of the stop." *Rodriguez*, 135 S. Ct. at 1615 (internal quotation marks omitted).

The mission of the stop—assessing whether the vehicle was involved in the bank robbery—was ongoing throughout Deputy Uher's interaction with Pihl. Law enforcement pursued that mission diligently and without measurable delay. Thus, the duration of the stop was reasonable. *Cf. United States v. Murillo-Salgado*, 854 F.3d 407, 415-16 (8th Cir. 2017) (finding that a twenty-three minute stop, which began as a traffic stop but developed into an investigatory stop, was not unconstitutionally prolonged).

## C.

Finally, we consider the appellants' challenge to law enforcement's search of the trunk of the Taurus. The district court found that they lacked standing to challenge the search of the trunk because they did not have "a reasonable expectation of privacy in the property to be searched." Only Pihl and Monden challenge the search of the trunk on appeal.

We review whether an individual has standing to challenge a search *de novo*. *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015). "Fourth Amendment rights are personal rights that may not be asserted vicariously." *Id.* "An individual asserting Fourth Amendment rights must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Id*. (internal quotation marks omitted). To establish standing, "[t]he defendant

-11-

moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search." *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995) (per curiam). In determining whether an individual has standing to challenge a vehicle search, "ownership" and "permission" play an important role. *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994); *see also United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998). We have held that an individual lacked standing because "he did not own the car, and the owner did not give him permission to use it." *Gomez*, 16 F.3d at 256 (finding the defendant lacked a reasonable expectation of privacy in a vehicle, even where a "third party told [the defendant] the owner had given permission for its use"). While the standing analysis may include other factors as well, *see id.*, neither Pihl nor Monden identify any such considerations in this case.

In a July 2016 interview, Farrah Franklin, the owner of the gray Taurus, told officers that she did not know Mosley, Monden, or Pihl and had not given them permission to use her car. In fact, Franklin had called the Cedar Rapids Police Department on the day of the bank robbery to report the vehicle stolen, though she never completed a formal report. The car was registered in Franklin's name. Franklin's husband, Cedric Rivers, testified at the suppression hearing that he borrowed the car with Franklin's permission and then loaned it to Monden. He testified that Franklin had, in the past, specifically told him not to loan the car to Monden and generally not to let anyone else use the vehicle.

Pihl contests the search of the trunk but does not contest the fact that she lacked permission to drive the vehicle or that she failed to otherwise establish an expectation of privacy in the vehicle. Without an expectation of privacy in the Taurus, Pihl lacks standing to challenge the search of the trunk. *See Muhammad*, 58 F.3d at 355.

Monden argues that he has standing to challenge the search of the trunk because Rivers gave him permission to use the vehicle, which created an expectation of privacy in the vehicle. However, Rivers himself acknowledged that Franklin did not know that he loaned the car to Monden on this occasion and that she had specifically prohibited him from loaning the car to other people. Thus, even if Monden were correct in suggesting that, under certain circumstances, standing could derive from permission given by an authorized user other than the owner of the vehicle, Rivers expressly lacked authority to permit Monden to use the vehicle. That fact invalidates any purported permission given by Rivers and distinguishes this case from those raising the more difficult question regarding permission from an unrestricted authorized user. *Cf. United States v. Long*, 870 F.3d 792, 797 n.3 (8th Cir. 2017) (noting "the existence of a circuit split as to whether even a driver with permission directly from the contractually authorized driver has standing to challenge a search of the rental vehicle").

Nevertheless, Monden seems to suggest that because he borrowed the vehicle from Rivers "on a regular basis," this use evolved into a basis for his reasonable expectation of privacy in the vehicle. However, Monden's only support for that proposition is Rivers's testimony that Rivers "usually" loaned him the vehicle, "a few times" to "run to the store." That very limited and unauthorized permission did not create a reasonable expectation of privacy in the vehicle, especially where "everybody knows it's [Franklin's] car." Without any additional evidence explaining why he had a reasonable expectation of privacy in the vehicle, Monden has failed to carry his burden of proving he has standing to challenge the search of the trunk. *See Gomez*, 16 F.3d at 256; *cf. Long*, 870 F.3d at 797 (finding, in the rental-car context, that an individual who was "an unauthorized-driver-once-removed, with only indirect permission from the authorized driver to drive the vehicle, does not have standing to challenge the search of the vehicle").

Because Pihl and Monden lack standing to challenge the search of the trunk, the district court correctly denied the motions to suppress on this ground.

## III.

We now turn to Mosley's challenge to his designation as a career offender pursuant to U.S.S.G. § 4B1.1. A person qualifies as a career offender if (1) he was eighteen years or older at the time he committed the instant offense of conviction, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) he has at least two prior felony convictions for either a crime of violence or a controlled substance offense. U.S.S.G. § 4B1.1(a). Mosley argues that he is not a career offender because (1) his instant offense is not a crime of violence and (2) his prior convictions for Illinois robbery and Iowa second-degree robbery do not constitute crimes of violence. We review *de novo* a district court's determination that a conviction qualifies as a crime of violence under the sentencing guidelines. *United States v. Maid*, 772 F.3d 1118, 1120 (8th Cir. 2014).

Here, however, it is unnecessary to consider whether Mosley's prior offenses qualify as crimes of violence because any error the district court may have committed would be harmless. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Without the career offender enhancement, Mosley's guideline range would have been 70-87 months. With the enhancement, his guideline range was 151-188 months. The district court applied the enhancement and then varied downward, imposing a sentence of 132 months. It explained that its sentence "would be the same with or without the . . . career offender enhancement." Furthermore, the court supplemented that determination with a thorough analysis of the 18 U.S.C. § 3553(a) factors, finding that a sentence of 132 months was sufficient but not greater than necessary to accomplish all sentencing purposes. Thus, we affirm the sentence imposed by the district court. *See United States v. Davis*, 583 F.3d 1081, 1095 (8th Cir. 2009)

-14-

("Because the district court explicitly stated it would have imposed [the same sentence] regardless of whether Davis was a career offender, any error on the part of the district court is harmless, and we affirm.").

## IV.

For the foregoing reasons, we affirm the district court's denial of appellants' motions to suppress and the sentence imposed on Mosley.

_____