# United States Court of Appeals
### For the Eighth Circuit

_____

No. 12-3535

_____

United States of America

*Plaintiff - Appellee*

v.

Jesus Quintero-Felix

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Sioux City

_____

Submitted: April 10, 2013
Filed: May 1, 2013

_____

Before LOKEN and GRUENDER, Circuit Judges, and PHILLIPS,[1] District Judge.

_____

GRUENDER, Circuit Judge.

Jesus Quintero-Felix was convicted of conspiracy to distribute fifty grams or more of actual (pure) methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, and of aiding and abetting the distribution of fifty grams or

_____

[1]The Honorable Beth Phillips, United States District Judge for the Western District of Missouri, sitting by designation.

more of methamphetamine mixture, in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2. On appeal, Quintero-Felix argues that the district court[2] erred in denying his motion to suppress evidence and statements obtained during a routine traffic stop because the officer lacked reasonable suspicion to prolong the stop. He also contends that the evidence was insufficient to support his convictions. For the following reasons, we affirm the district court's denial of Quintero-Felix's motion to suppress and affirm his convictions.

On December 11, 2011, in Fort Dodge, Iowa, law enforcement officers conducted a controlled drug purchase in which an informant purchased approximately four ounces of methamphetamine with $6,000 of pre-marked currency from Rennee Auten at her home. Prior to and during the transaction, officers observed a blue truck with a California rear license plate in the driveway in front of Auten's home. At the conclusion of the transaction, officers saw two Hispanic males drive away from the Auten residence in the same blue truck. Officers followed the blue truck to a convenience store before it left Fort Dodge, noting the California license plate number of the vehicle.

A few hours later, Officer Matthew McKinney of the Omaha Police Department conducted a traffic stop of a blue truck with a California rear license plate because the vehicle did not have a front license plate as required under California law.[3] Officer McKinney approached the truck, explained the reason for the stop to the two occupants, and requested identification from them. He determined that the

---

[2]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa, adopting the Report and Recommendations of the Honorable Paul A. Zoss, United States Magistrate Judge for the Northern District of Iowa.

[3]A camera inside of the patrol vehicle and a microphone on Officer McKinney captured a video and audio recording of the encounter.

driver of the vehicle was Quintero-Felix and the sole passenger was Carlos Zamudio-Hernandez. However, Quintero-Felix did not have a driver's license.[4] When McKinney initially questioned Quintero-Felix, Zamudio-Hernandez answered for him. According to Officer McKinney, Quintero-Felix also exhibited nervous behavior throughout the encounter: his hands were shaking, his legs were bouncing, and he was picking imaginary balls of lint from his shirt.

Quintero-Felix complied with Officer McKinney's request to sit in the patrol car to review his identification and paperwork while Zamudio-Hernandez remained in the truck. While awaiting data checks on both individuals, Officer McKinney spoke separately with Quintero-Felix and Zamudio-Hernandez. The men provided conflicting stories regarding their travel itinerary. Quintero-Felix initially told Officer McKinney that the two men had come from Columbus, Nebraska, then later said they had come from Fort Dodge, Iowa. Quintero-Felix also told the officer that they were on their way to California, while Zamudio-Hernandez said they were going to Columbus, Nebraska. Quintero-Felix later said that they were going to Columbus to visit friends for a couple of days, but then he said that he needed to return to California for work on Tuesday, which was two days later. When Officer McKinney asked Quintero-Felix about the purpose of their trip, Quintero-Felix told him that they had come from California so Zamudio-Hernandez could give a gift to a former girlfriend. However, Quintero-Felix did not know the former girlfriend's name, nor did he know what the gift was. The story also struck Officer McKinney as unusual because Quintero-Felix told him that Zamudio-Hernandez was married to his cousin.

As Quintero-Felix sat in the patrol car, Officer McKinney wrote him a warning ticket for failing to have a front license plate or a driver's license. Officer McKinney

---

[4]Although Quintero-Felix did not have a driver's license, he did have a Mexican consular card as well as the registration and insurance information for the vehicle.

then returned Quintero-Felix's documentation and told him that he was free to go. After Quintero-Felix opened the patrol car door, Officer McKinney inquired whether he could ask a few more questions. Quintero-Felix then closed the door and continued to answer the officer's questions. When Officer McKinney asked Quintero-Felix if he could search the vehicle, Quintero-Felix told him that it was fine with him but that the officer would need to ask Zamudio-Hernandez as well. Zamudio-Hernandez denied Officer McKinney consent to search the vehicle but agreed to allow a drug dog sniff. Another officer arrived with a drug dog, and the dog alerted to the presence of drugs. Based on the drug dog's response, the officers then searched the truck. During the search, Officer McKinney observed a hidden compartment with cash inside in the floor below the driver's seat. The truck was then impounded for a more thorough search, and officers ultimately uncovered $16,000 in cash and a handgun inside the hidden compartment. Law enforcement officers subsequently matched the blue truck to the one observed during the controlled drug purchase in Fort Dodge, Iowa, and identified $6,000 of the currency seized from the truck as the pre-marked currency used for the controlled drug purchase at the Auten residence. A two-count indictment charged Quintero-Felix and others with conspiracy to distribute methamphetamine and with aiding and abetting the distribution of methamphetamine. Quintero-Felix filed a motion to suppress evidence and statements obtained as a result of the traffic stop, which the district court denied.

Auten subsequently was arrested for her involvement in the controlled drug purchase and cooperated with law enforcement, testifying at Quintero-Felix's trial. She testified that she had been involved in the distribution of methamphetamine for several months in 2011 and that Quintero-Felix and Zamudio-Hernandez had delivered nearly two pounds of methamphetamine from California to her in Fort Dodge in four separate transactions. Although Auten communicated primarily with Zamudio-Hernandez, Quintero-Felix and Zamudio-Hernandez arrived together, and both men handled the money and the methamphetamine over the course of the four transactions. The day before the December 11, 2011 controlled drug purchase both

men arrived at Auten's home to deliver the methamphetamine and both men stayed at Auten's home until the informant received the drugs.  When the informant arrived, Auten exchanged four ounces of methamphetamine for $6,000.  She then handed the money she received to Zamudio-Hernandez, all in the presence of Quintero-Felix.  Auten's boyfriend, Eric Olson, also testified that both Quintero-Felix and Zamudio-Hernandez were present at Auten's residence on the day of the controlled drug purchase.  A jury convicted Quintero-Felix on both counts of the indictment.

Quintero-Felix first appeals the denial of his motion to suppress.  "In reviewing a denial of a motion to suppress, we review the district court's factual determinations for clear error and its legal conclusions *de novo*."  *United States v. Parish*, 606 F.3d 480, 486 (8th Cir. 2010).  "We will affirm the district court 'unless the denial of the motion "is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake was made."'"  *United States v. Zamora-Lopez*, 685 F.3d 787, 789 (8th Cir. 2012) (quoting *United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008)).

Quintero-Felix does not argue that the initial traffic stop was unlawful or that it was improper for Officer McKinney to collect documentation, run background checks, or ask questions about his travel plans.  Instead, Quintero-Felix contends that his detention was unreasonably extended once the warning ticket was issued and his documentation was returned.  After a law enforcement officer initiates a traffic stop, the officer "may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation."  *United States v. Barragan*, 379 F.3d 524, 528 (8th Cir. 2004).  These tasks include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning.  *Id.* at 528-29.  An officer also may request that the driver sit in the patrol car to answer questions and may ask questions about his itinerary.  *United States v. McCarty*, 612 F.3d 1020, 1024-25 (8th Cir. 2010).  However, once an officer finishes these tasks, "the purpose

-5-

of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, 'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention' or unless the continued encounter is consensual." *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007) (quoting *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001)). "Whether a particular detention is reasonable in length is a fact-intensive question." *United States v. Suitt*, 569 F.3d 867, 871 (8th Cir. 2009) (quoting *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007)). "Reasonableness . . . is measured in objective terms by examining the totality of the circumstances." *Id.* (quoting *United States v. $404,905.00 in U.S. Currency*, 182 F3d 643, 646 (8th Cir. 1999)).

The district court's factual findings, which were not clearly erroneous, support the conclusion that Officer McKinney had reasonable suspicion to extend the traffic stop. When Officer McKinney initially questioned Quintero-Felix, Zamudio-Hernandez answered for him.[5] Then, throughout the stop, Quintero-Felix exhibited unusually nervous behavior, including shaking hands, bouncing legs, and acting as if he were picking imaginary lint balls from his shirt. *See United States v. Bloomfield*, 40 F.3d 910, 918-19 (8th Cir. 1994) (explaining that "although it is customary for people to be 'somewhat nervous'" when stopped by police, extreme nervousness may contribute to an officer's reasonable suspicion). In addition, Quintero-Felix and Zamudio-Hernandez provided conflicting and contradictory stories about their travel itinerary. *See United States v. Brown*, 345 F.3d 574, 578 (8th Cir. 2003) (holding that conflicting stories may provide justification to expand the scope of the stop and detain the occupants). Based on the totality of the circumstances, the district court did not err in concluding that Officer McKinney had reasonable suspicion to justify

---

[5]Quintero-Felix argues that Officer McKinney did not know the extent to which Quintero-Felix was fluent in English. However, Officer McKinney testified that he had no difficulty conversing with Quintero-Felix in English, and the recording of the traffic stop shows that Quintero-Felix was responsive to Officer McKinney's questions and that they had no difficulty understanding each other.

extending the traffic stop, and we cannot conclude that an extension of approximately seven minutes is unreasonable. *See United States v. Lyons*, 486 F.3d 367, 372 (8th Cir. 2007) (holding that thirty-one-minute wait for arrival of drug dog was neither excessive nor unreasonable extension of traffic stop).[6]

Even if Officer McKinney lacked reasonable suspicion to extend the stop, the facts here establish that his actions were nonetheless proper because a reasonable officer could have concluded that Quintero-Felix consented to the extension of the stop. Whether an encounter is consensual "turns upon the unique facts of each case." *Jones*, 269 F.3d at 925. However, "[t]he determination of whether a reasonable officer would believe that [a defendant] consented is a question of fact, subject to review for clear error." *United States v. Guerrero*, 374 F.3d 584, 588 (8th Cir. 2004). We cannot conclude that the district court clearly erred in holding that a reasonable officer could have believed the extension of the traffic stop was consensual. Officer McKinney had given Quintero-Felix a written warning, returned his identification, and told him he was free to leave. Quintero-Felix then opened the door of the patrol car when Officer McKinney inquired if he could ask a few questions. Quintero-Felix responded by closing the door, remaining in the vehicle, and answering additional questions from Officer McKinney. He then consented to the search of the vehicle. *See United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010) (holding that the fact that defendant reached for the door handle before the law enforcement officer asked for a moment of his time to answer additional questions showed that "[the defendant] felt free to leave, but then agreed to cooperate further"). Based on these facts, the

[6]Moreover, "[e]ven . . . without reasonable suspicion, we have upheld seizures of less than ten minutes as *de minimis* intrusions that do not amount to an unreasonable seizure." *United States v. Robinson*, 455 F.3d 832, 834 (8th Cir. 2006). Approximately seven minutes elapsed between the time Officer McKinney issued the warning ticket and the time the drug dog alerted on the vehicle.

district court properly concluded that a reasonable officer could have believed that Quintero-Felix consented to the continuation of the encounter.

Because reasonable suspicion existed to extend the traffic stop, and alternatively, because Quintero-Felix consented to the continuation of the encounter, the district court did not err in denying the motion to suppress.

Quintero-Felix also argues that the district court erred in denying his motion for judgment of acquittal because the evidence presented at trial was insufficient to support his convictions. We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the verdict and giving the verdict the benefit of all reasonable inferences. *United States v. Casteel*, 663 F.3d 1013, 1019 (8th Cir. 2011). "A court should not weigh the evidence or assess the credibility of witnesses." *United States v. Santana*, 524 F.3d 851, 853 (8th Cir. 2008). "We reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Casteel*, 663 F.3d at 1019 (quoting *United States v. Birdine*, 515 F.3d 842, 844 (8th Cir. 2008)).

Quintero-Felix was convicted of conspiracy to distribute fifty grams or more of actual (pure) methamphetamine and of aiding and abetting the distribution of fifty grams or more of methamphetamine mixture.[7] To find him guilty of conspiracy to distribute methamphetamine, the Government needed to prove: (1) that there was a conspiracy (i.e., an agreement to distribute drugs); (2) that Quintero-Felix knew of the conspiracy; and (3) that Quintero-Felix voluntarily and intentionally joined the conspiracy. *See United States v. Jiminez*, 487 F.3d 1140, 1146 (8th Cir. 2007). To find Quintero-Felix guilty of aiding and abetting the distribution of methamphetamine, the Government needed to prove (1) that Quintero-Felix

---

[7]Quintero-Felix does not challenge the jury's drug quantity determinations.

associated himself with the unlawful venture (namely, the distribution of methamphetamine); (2) that he participated in the unlawful venture as something he wished to bring about; and (3) that he sought by his actions to make the unlawful venture succeed. *See United States v. Blaylock*, 421 F.3d 758, 773 (8th Cir. 2005). The existence of a conspiracy may be proved by direct or circumstantial evidence, *United States v. Cain*, 487 F.3d 1108, 1111 (8th Cir. 2007), but "a defendant's mere presence, coupled with the knowledge that someone else who is present intends to sell drugs, is insufficient to establish membership in a conspiracy." *United States v. Ruiz-Zarate*, 678 F.3d 683, 690 (8th Cir. 2012) (quoting *United States v. Rolon-Ramos*, 502 F.3d 750, 754 (8th Cir. 2007)).

The evidence presented at trial was sufficient to support Quintero-Felix's convictions. A co-conspirator, Rennee Auten, testified that she received nearly two pounds of methamphetamine from Quintero-Felix and Zamudio-Hernandez. She further testified that the two men transported the methamphetamine from California to Iowa and that they delivered the methamphetamine to her residence in Fort Dodge in four separate transactions. Although Auten primarily communicated with Zamudio-Hernandez, she testified that both Zamudio-Hernandez and Quintero-Felix arrived together from California and that both men handled the methamphetamine and the money during some of the transactions. Auten also described the involvement of both men in the controlled purchase of methamphetamine at her home on December 11, 2011, testifying that both men arrived the day before to deliver the methamphetamine and stayed at her home until the informant received the drugs. This testimony alone is sufficient to support the jury's verdict. *See United States v. Buckley*, 525 F.3d 629, 632-33 (8th Cir. 2008) ("We have repeatedly upheld jury verdicts based solely on the testimony of conspirators and cooperating witnesses, noting that it is within the province of the jury to make credibility assessments and resolve conflicting testimony."). Moreover, Auten's testimony also was corroborated by the testimony of her boyfriend, Eric Olson, and by other evidence that established

Quintero-Felix's participation in the controlled purchase at Auten's residence. Officers outside Auten's home during the December 11, 2011 controlled drug purchase observed a blue truck with a California rear license plate parked in front of Auten's home. Then, after the controlled purchase had ended, the officers saw two Hispanic males drive away from Auten's residence in the truck and leave Fort Dodge. Two hours later, during a traffic stop, Quintero-Felix was found driving an identical truck with Zamudio-Hernandez in the passenger seat. During a search of the truck, officers found $16,000 and a handgun inside a hidden compartment located in the floor board at Quintero-Felix's feet. *See United States v. Thompson*, 686 F.3d 575, 579-80 (8th Cir. 2012) (explaining that the intent to distribute drugs may be inferred from large sums of unexplained cash and the presence of firearms). Further, a portion of that currency matched the $6,000 in pre-marked money used just hours before in the controlled methamphetamine purchase at Auten's residence.

Quintero-Felix argues that the evidence merely established that he "tagged along with" Zamudio-Hernandez as he delivered methamphetamine to Auten. However, we conclude that the evidence established more than Quintero-Felix's mere presence at these methamphetamine transactions and was sufficient for a reasonable jury to conclude that Quintero-Felix had been involved in transporting nearly two pounds of methamphetamine from California to Iowa to deliver to Auten on four separate occasions. Based on this conclusion, a reasonable jury could convict Quintero-Felix of conspiracy to distribute methamphetamine and of aiding and abetting the distribution of methamphetamine.

For these reasons, we affirm.

_____