# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-2343

_____

United States of America

*Plaintiff - Appellant*

v.

Brent F. Englehart

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: November 20, 2015
Filed: January 27, 2016

_____

Before RILEY, Chief Judge, BEAM and KELLY, Circuit Judges.

_____

BEAM, Circuit Judge.

The United States appeals the district court's grant of Brent Englehart's motion to suppress in this criminal action. For the reasons stated herein, we reverse.

## I.    BACKGROUND

First and notably, all parties involved in this case to-date, including the district court, believed they were "flying blind" to some degree, in that the entirety of the factual record was based on only a visual, soundless, recording of the encounter between Omaha Police Officer Liebe and Englehart, along with the officers' testimony and written reporting subsequent to the stop and interview.  The district court, understandably, found itself somewhat hindered by this fact.  The recording submitted with the record on appeal, however, has audio.  Therefore, the timing of the stop, the sequence of questions and reactions between Englehart and Officer Liebe, and all other necessary objective observations have been viewed and documented by this court.  That said, with a few key highlights or distinctions, the facts relied upon by the magistrate judge and district court closely track the encounter between Officer Liebe and Englehart.  Below, we recite the previously relied-upon facts, altering or supplementing where necessary to accurately portray the encounter.

On June 29, 2014, Officer Liebe observed Englehart operating a Chevy Avalanche, traveling westbound on Interstate 80 in Omaha, Nebraska.  Officer Liebe initiated a traffic stop of Englehart for following too closely behind another vehicle.  A camera in the police cruiser recorded the stop.

After Officer Liebe activated his lights, Englehart pulled over, parking his vehicle on the inside shoulder of Interstate 80 westbound, thus positioning the driver's side of the vehicle nearest the center cement divider and farthest away from westbound traffic.  According to Officer Liebe's testimony, he approached Englehart in his vehicle, introduced himself, explained the reason for the traffic stop, and asked for Englehart's license, registration, and proof of insurance.  Officer Liebe testified that he noticed a strong odor of air freshener from inside Englehart's vehicle.  Officer Liebe also recalled that when he asked Englehart where he was headed, Englehart responded that he was going hiking in Wyoming.  Further, Officer Liebe noticed a

-2-

cooler on the passenger floorboard, a large amount of luggage, and sacks and debris from a gas station or fast-food restaurant, from which the officer deduced Englehart was not local and had been traveling for some time. Officer Liebe requested that Englehart sit in the patrol car while he prepared a written warning for the traffic violation and Englehart complied. Once inside the patrol car, the audio and visual recording documented the encounter between the two men. Englehart sat beside Officer Liebe in the front seat of the patrol car because it was a K-9 unit and the dog cage abutted the front compartment of the officer's vehicle.

In the vehicle, as Officer Liebe was completing the checks necessary to issue the warning citation, he again explained to Englehart the reason he pulled him over and asked Englehart if he understood what that meant. Then, Officer Liebe asked Englehart a series of questions, specifically inquiring about the location of Harrisburg, Pennsylvania (which appeared to be the city noted on Englehart's driver's license as his home address), the purpose of Englehart's travels, where Englehart was headed for his camping trip, who he was meeting, the kind of work Englehart did, and other small talk. Englehart explained that he was from central Pennsylvania, was headed to Wyoming to meet his cousin to go camping, and explained that he worked for a Hampton Inn and Suites hotel. When asked directly *where* in Wyoming he was going camping, Englehart could not remember, explaining that he was meeting his cousin who lived there and who worked on a horse ranch. Englehart additionally explained that he would be camping for a week and that he had to get back to work because two weeks was his limit. Before running Englehart's driver's license, Officer Liebe asked Englehart if it had ever been suspended or revoked and whether Englehart had any previous arrests. Englehart responded that he was fairly certain his license was not suspended (although he remembered a time when such action was threatened) and that he had never been arrested.

Twice during the time Officer Liebe was completing the issuance of the warning, Englehart expressed notable confusion or frustration: once regarding the

reasons for a certain question about how much he weighed, and later, his discomfort about sitting in the patrol car, stating that it made him feel like he did something wrong. As to the former, Officer Liebe explained that he inquired about Englehart's weight because his computer system requested that information from the driver's license, which had not scanned into the system correctly. Officer Liebe later testified that he found Englehart's reactions in these instances significant because people typically do not get concerned about something as simple as, say, a question about their weight. This initial encounter in the patrol car between Officer Liebe and Englehart during which the two visited and Officer Liebe completed the checks necessary to issue the traffic warning took approximately twelve minutes. Once Officer Liebe received word on the radio that Englehart's license was valid and that there were no other problems, he handed Englehart his license, registration, and proof of insurance.

As Englehart collected his materials and opened the door to leave, Officer Liebe said, "here you go, sir, I appreciate you being cooperative, hope you have a safe camping trip, hey mind if I ask you a quick question?" Englehart stayed seated and turned to Officer Liebe. Officer Liebe then explained his responsibility not only to monitor traffic safety but to look for people involved in criminal activity, smuggling narcotics and firearms and large sums of cash, and the like. Officer Liebe asked Englehart if he had any firearms, illegal narcotics, or large sums of cash. Englehart answered "no" to each question. When specifically asked, Englehart stated he had "about a grand" in cash on him and initially answered "no" when Officer Liebe asked if he had any "personal use narcotics." Officer Liebe then asked, "do you have a problem if I search your car?" Englehart did not answer unequivocally, but stated that he did not see the need for it given his cooperation, that he did not think that he had given Officer Liebe a reason to get to that point, and he expressed his displeasure with the proposition of having his trunk ripped apart on the interstate. Officer Liebe assured Englehart that he would not do that and then stated, "I'll tell you what I'll do," and said he would just run his dog around the vehicle quick, telling Englehart that if

-4-

the dog alerts, he would search the truck but if it did not, Englehart would be sent on his way. Less than two minutes had passed from the time Officer Liebe completed the traffic warning citation to when Officer Liebe announced that he would conduct the dog sniff. Officer Liebe later testified that he felt that Englehart was agitated by his questions and that although he never received a direct response from Englehart regarding his request to search, Officer Liebe interpreted Englehart's subsequent statements and "perturbed" or annoyed demeanor as a refusal to search.

Officer Liebe called for backup to conduct the K-9 search. While they waited, Officer Liebe asked Englehart if he had previously had a bad run in with police, and Englehart stated that he had–that in the past his experience was that the police went out of their way to make things harder than needed. Officer Liebe then explained that given his experience, the fact that Englehart was traveling across country on his own and was unsure exactly where in Wyoming he was headed, left Officer Liebe unsure as to whether Englehart was involved in criminal activity. Again, Officer Liebe asked Englehart directly if he was involved in criminal activity. Englehart was visibly agitated, exclaimed "no," and expressed frustration with having to sit in the patrol car to receive his warning for following too close, explaining that he was not used to such a procedure and that he was concerned with Officer Liebe's call for backup, and the like–that now he *really* felt like he did something wrong. Officer Liebe stated that the backup was called for his safety given their location on the busy interstate and then stated:

> Just bear with me. I'm just gonna wait for one of them to show up here so we can get it and I'll run my dog quick. If my dog doesn't alert, then we'll send you on your way. Is there any reason why he would, or, . . . 'cause you seem kinda irritated with it. I'm kinda wonderin' if maybe you're nervous, got some personal use, because I'll tell ya right now, man, I'm, I'm not too concerned about personal use.

-5-

At this point Englehart immediately stated, "Yeah, I do have a little bit of personal use in there." Englehart made this statement sixteen minutes after initially sitting down in the patrol car, just over four minutes after Officer Liebe completed the traffic warning citation, and just under three minutes after Officer Liebe stated that he intended to conduct a dog sniff of Englehart's vehicle. Englehart confirmed, when asked directly by Officer Liebe, that his "personal use" was marijuana. While the two waited for the backup to arrive, Officer Liebe repeatedly stated to Englehart during conversation (no less than thirteen times) that he wasn't concerned about a personal use amount of drugs, that he wasn't worried about it, that he wouldn't write a ticket for it, and that he wouldn't arrest Englehart for personal use–that that's what he (Officer Liebe) would do for Englehart. Officer Liebe explained that his job was to locate large amounts of drugs or cash and large-scale smugglers. The two waited approximately eight more minutes from the time of Englehart's confession regarding the personal use narcotics before Officer Liebe searched Englehart's vehicle. In the end, however, Officer Liebe never employed his dog to sniff Englehart's vehicle.

During the search, Officer Liebe located a small amount of hash in the center console of Englehart's vehicle as well as a toolbox containing $351,360.00. Officer Liebe returned to the patrol car and arrested Englehart "for the marijuana," and indicated that investigators would likely want to talk to Englehart about the cash. Thereafter, Officer Liebe transported Englehart to the Omaha Police Impound Facility where the truck was further searched and Englehart was questioned by Omaha Police Officer Andersen and Omaha Police Sergeant Worley. The officers advised Englehart of his Miranda rights and Englehart agreed to answer questions. Englehart was not charged with any crimes that day. Englehart disclaimed ownership of the cash recovered in his vehicle and was released along with his vehicle. In the Disclaimer of Ownership of Assets form, Englehart indicated that the assets came into his possession from five to seven years of selling "weed." The investigation remained ongoing and five months later, Englehart was indicted on multiple counts, including conspiracy to distribute and possession with intent to distribute marijuana, attempted

-6-

possession with intent to distribute marijuana, traveling in interstate commerce with the intent to distribute proceeds of and promote an unlawful activity, promotion of money laundering, and forfeiture.

Englehart filed a motion to suppress evidence, asking that the district court suppress the $351,360.00 that was removed from his vehicle, as well as all statements he made on the grounds that he had been illegally detained and that the search lacked legal justification. Discussed more thoroughly below, the district court granted the motion. The government appeals.

## II. DISCUSSION

"In reviewing the district court's grant of [Englehart's] motion to suppress, we review the district court's legal conclusions de novo and its factual findings for clear error." United States v. Cowan, 674 F.3d 947, 952 (8th Cir. 2012).

Very generally, the magistrate judge determined that after Officer Liebe told Englehart he was free to leave, Englehart agreed to answer additional questions, and thus that portion of the encounter was consensual. However, the magistrate judge held that the consensual nature changed once Englehart resisted Officer Liebe's desire to conduct a discretionary sniff of the vehicle and, additionally, that Officer Liebe lacked reasonable suspicion to extend the traffic stop in order to conduct the dog sniff. Given these conclusions and applying the then-recent Supreme Court precedent in Rodriguez v. United States, 135 S. Ct. 1609, 1614-16 (2015), which held that absent reasonable suspicion a police officer's extension of a traffic stop in order to conduct a dog sniff violates the Fourth Amendment, the magistrate judge held that all statements made by Englehart after he resisted Officer Liebe's desire to employ his K-9, as well as the physical evidence obtained thereafter, were obtained in violation of Englehart's Fourth Amendment rights and should be suppressed. The district court adopted the magistrate judge's report and recommendation in its entirety, clarifying

that Officer Liebe unlawfully detained Englehart and noting that, at the point Englehart indicated he did not want his vehicle searched the encounter was no longer consensual, and Officer Liebe lacked reasonable suspicion to continue the detention. The district court additionally addressed the government's alternative argument, acknowledging that the recent Supreme Court pronouncement in Rodriguez did not apply in the instant analysis, but nonetheless held that the thirty-minute detention here was not *de minimis*.[1]

As noted by the magistrate judge and the district judge, the legitimacy of the initial stop is not in question here. Nor does Englehart argue that it was improper for Officer Liebe to collect his documentation, run the necessary checks, or ask questions about his travel plans. Officer Liebe completed the necessary steps to complete the traffic warning citation. "After a law enforcement officer initiates a traffic stop, the officer 'may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" United States v. Quintero-Felix, 714 F.3d 563, 567 (8th Cir. 2013) (quoting United States v. Barragan, 379 F.3d 524, 528 (8th Cir. 2004)). These routine tasks include "computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." Barragan, 379 F.3d at

---

[1]Eighth Circuit precedent at the time of the stop had permitted a *de minimis* extension of a stop to employ a dog. United States v. Rodriguez, 741 F.3d 905, 907 (8th Cir. 2014), overruled by Rodriguez, 135 S. Ct. at 1614. Although Rodriguez was overruled prior to the district court's analysis in the matter, we apply the law of the circuit as it existed at the time of the stop. Davis v. United States, 131 S. Ct. 2419, 2423-24 (2011) ("Because suppression would do nothing to deter police misconduct in these circumstances, and because it would come at a high cost to both the truth and the public safety, we hold that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."). Thus the inquiry here requires an application of the then-existing Eighth Circuit precedent allowing for a *de minimis* extension in some circumstances. United States v. Rodriguez, 799 F.3d 1222, 1224 (8th Cir. 2015).

528-29.  Too, "[a]n officer also may request that the driver sit in the patrol car to answer questions and may ask questions about his itinerary."  Quintero-Felix, 714 F.3d at 567.

Our focus today is on the encounter between Englehart and Officer Liebe once the officer concluded the work necessary to resolve the traffic violation for which he had pulled Englehart over, handed Englehart his belongings, and indicated he was done.  In the normal course, once the officer finishes the tasks involved with the traffic violation "the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention or unless the continued encounter is consensual."  Id. at 567 (quoting United States v. Flores, 474 F.3d 1100, 1103 (8th Cir. 2007)).  Whether a particular detention is reasonable is a fact-intensive question, measured in objective terms by examining the totality of the circumstances.  Id. at 567.

Here, the government does not challenge the district court's determination that Officer Liebe did not have reasonable suspicion sufficient to detain Englehart beyond what the government calls "the consensual encounter phase" of the traffic stop.  Rather, the government argues that, applying then-existing circuit precedent, any extension of the stop following the issuance of the traffic warning citation was *de minimis*, and therefore legal on these facts.  Under this court's prior precedent, even without reasonable suspicion following the completion of a traffic stop, "seizures of less than ten minutes [were permissible] as *de minimis* intrusions [and did] not amount to an unreasonable seizure."  United States v. Robinson, 455 F.3d 832, 834 (8th Cir. 2006); see also United States v. Mohamed, 600 F.3d 1000, 1005 (8th Cir. 2010) (canine search conducted within five minutes of conclusion of a lawful stop was a *de minimis* intrusion on driver's personal liberty); United States v. Suitt, 569 F.3d 867, 873 (8th Cir. 2009) (canine sniff approximately three minutes after the conclusion of traffic stop constituted no more than a *de minimis* extension of the

stop); <u>United States v. Alexander</u>, 448 F.3d 1014, 1017 (8th Cir. 2006) (detention of at most four minutes from the point defendant notified he would receive a warning ticket to the time of the dog sniff only a *de minimis* intrusion). Such was the case in <u>Rodriguez</u>, mentioned previously, where this court initially held that a seven- or eight-minute delay in the deployment of a dog following the completion of the traffic stop was reasonable and constituted a *de minimis* intrusion on the defendant's personal liberty. <u>Rodriguez</u>, 741 F.3d at 907-08, <u>overruled by</u> <u>Rodriguez</u>, 135 S. Ct. 1609.

"Timing is everything" in many things but is especially important in this case. Defining the contours of the various, legally relevant time frames in this matter is key. The district court held that the approximately thirty-minute detention was not *de minimis*, as contemplated by this circuit's then-existing precedent. The district court clearly erred, however, in looking at the duration of the majority of the entire stop in its analysis of this issue. The legally significant time calculation begins at the time the purpose of the stop was completed; here, at the time Officer Liebe handed Englehart his belongings, and indicated he was done. <u>Mohamed</u>, 600 F.3d 1004-05 (analyzing the legal relevance of a continued detention from the time the purpose of the stop was completed to the time of a dog alert during a canine search). Officer Liebe completed the issuance of the traffic warning citation approximately twelve minutes after the two entered the patrol car. It is at *this* point that we must begin to quantify the time.

The district court and the magistrate judge both determined that at least some of the encounter between Officer Liebe and Englehart just following the completion of the traffic stop was consensual. The court did not clearly err in that conclusion.[2]

---

[2]The magistrate judge, whose report and recommendation was adopted by the district court in its entirety, held that the consensual encounter began when Officer Liebe told Englehart he was free to leave and Englehart agreed to answer additional questions, and "changed once [Englehart] resisted Officer Liebe's desire to conduct

-10-

Officer Liebe handed Englehart his license, registration, and proof of insurance, and as Englehart collected his materials and opened the door to leave, Officer Liebe said, "here you go, sir, I appreciate you being cooperative, hope you have a safe camping trip, hey mind if I ask you a quick question?" Englehart stayed seated and turned to Officer Liebe and answered several questions. Identifying these events as a consensual encounter was not clear error. See Quintero-Felix, 714 F.3d at 568 (holding that the district court did not clearly err in holding that an officer could have reasonably believed the suspect consented to the extension of the stop when the officer told him he was free to leave, he opened the door to exit, but remained in the vehicle and continued answering the officer's questions).

The other legally significant time in the encounter between Officer Liebe and Englehart occurred when Englehart admitted to possessing a personal use amount of an illegal narcotic. Just about four minutes after the completion of the stop, Englehart stated that he had a "little bit of personal use in [his vehicle]" and that it was marijuana. At this point, the landscape shifts regarding the subsequent search of the vehicle and the retrieval of the hash and cash because when Englehart told Officer Liebe there was marijuana in his vehicle, Officer Liebe had probable cause to search the vehicle for drugs. United States v. Coleman, 700 F.3d 329, 336 (8th Cir. 2012). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." Id. (quoting United States v. Ross, 456 U.S. 798, 825 (1982)); see also

_____

a discretionary sniff of the vehicle," which occurred just under two minutes after the completion of the traffic stop. The district court, however, appears to place the relevant time as to when the encounter changed from consensual to nonconsensual at the point Englehart "indicated he did not want his car searched, and the Officer understood the same," which is, actually, a different time, and occurred just under one minute following the completion of the traffic stop. We include both suppositions in our analysis concerning the legal relevance of this time frame, as the conclusion remains unchanged on these facts no matter which point in time is used.

-11-

United States v. McCarty, 612 F.3d 1020, 1026 (8th Cir. 2010) (admission there was marijuana in vehicle established probable cause to search for it, and discovery of marijuana provided probable cause to search the entire vehicle). Accordingly, the ultimate search of the vehicle by Officer Liebe, which produced the hash and, ultimately, the discovery of the cash, was lawful.

The time between the completion of the traffic stop and Englehart's admission regarding his possession of drugs (which effectively truncates any further analysis of the proverbial ticking, *de minimis* clock) likewise does not run afoul of constitutional constraints. First, as noted above, part of the encounter between the two during that time was consensual (whether that ended when Officer Liebe believed Englehart had effectively refused his request to search the vehicle, or the time when Officer Liebe informed Englehart that he intended to employ his K-9 to conduct a sniff of the vehicle). Second, even despite a determination as to whether a portion was consensual, the *entire* time was a *de minimis* intrusion on Englehart's personal liberty under this circuit's then-existing precedent. Assuming Englehart consented to answer some of Officer Liebe's questions, at most only about three and one-half minutes passed before Englehart admitted to possessing drugs, which gave Officer Liebe probable cause to search. And, even were we to assume that *none* of the extended time was consensual, only about four and one-half minutes passed before Englehart stated that he had drugs in his vehicle. Under this circuit's then-existing precedent, this minimal extension did not constitute an intrusion on Englehart's personal liberty and Officer Liebe had not unreasonably extended the stop at the time Englehart made his admission. See, e.g., Mohamed, 600 F.3d at 1004-05 (reviewing the legally significant time as the time the purpose of the stop was completed, when the officer told the defendant he was "good to go," and the defendant stayed to answer a few questions, without discussion as to whether the encounter was consensual); Robinson, 455 F.3d at 834.

That said, the most significant fact in this case is that Englehart admitted to possession of drugs during the relevant time frame under review. At the time of Englehart's admission, Officer Liebe had informed Englehart that he was going to employ his K-9 to conduct a sniff and had called for backup assistance to do so. If Englehart had not admitted to possessing drugs, this would very well be a different case, but the facts dictate the result here.[3] As it is, the brief extension of the traffic

_____

[3]Englehart argues, without supporting case citation references, that his admission was elicited by Officer Liebe's promise to let him go if he only had a small amount of marijuana in the vehicle. He claims "any citation of authority [on this point] would be sheer pedantry." Supporting citations would have been helpful, however, as such tactics on the part of the police are not uncommon and do not further bear on the instant analysis since Englehart's admission occurred during a *de minimis*, and therefore permissible, extension of the traffic stop. "The test for determining the voluntariness of a confession is whether the police extracted the confession by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Estey, 595 F.3d 836, 839 (8th Cir. 2010) (quoting United States v. Gannon, 531 F.3d 657, 661 (8th Cir. 2008)). Here, most importantly, before Englehart's admission, Officer Liebe had only once commented that he was not "too concerned about personal use." Thus, on these facts, Officer Liebe's comment cannot be accurately portrayed as a legally meaningful promise or inducement in support of a voluntariness challenge. Even were we to indulge that discussion, however, the single comment by Officer Liebe, on these facts, would not render Englehart's admission involuntary. See United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002) (noting that raised voices and promises of leniency do not render a confession involuntary); United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (promise of leniency, by itself, does not make confession involuntary). "[A] promise made by law enforcement not to arrest or prosecute does not render a confession involuntary." United States v. Thunderhawk, 799 F.3d 1203, 1206 (8th Cir. 2015) (reiterating that the polestar is always to determine whether or not the authorities overbore the defendant's will and critically impaired his capacity for self-determination); see also Dowell v. Lincoln Cty., Mo., 762 F.3d 770, 775-76 (8th Cir. 2014). We recognize that following Englehart's admission Officer Liebe made multiple statements to Englehart that he would not cite him or arrest him for the

-13-

stop was merely a *de minimis* intrusion on Englehart's personal liberty and the resulting search and arrest was supported by probable cause.

## III. CONCLUSION

For the reasons stated herein, we reverse the district court's grant of Englehart's motion to suppress and remand for further proceedings.

_____

marijuana and would, in fact, let him go if that is all that was found. However, because those statements followed Englehart's admission (the key point in the instant analysis) they are not relevant to the inquiry, no matter that there might be varying opinions about such tactics. Officer Liebe had probable cause to search the vehicle and the discovery of the hash supported the ultimate arrest. See United States v. Perdoma, 621 F.3d 745, 749-50 (8th Cir. 2010).