NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA,
*Appellee*,

*v.*

KRISTOPHER WILLIAM DOUGLAS,
*Appellant.*

No. 1 CA-CR 20-0516
FILED 2-22-2022

Appeal from the Superior Court in Mohave County
No. S8015CR201900775
The Honorable Derek C. Carlisle, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael Valenzuela
*Counsel for Appellee*

Mohave County Legal Advocate, Kingman
By Jill L. Evans
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge D. Steven Williams and Judge David B. Gass joined.

---

**M O R S E**, Judge:

**¶1** Kristopher William Douglas appeals his conviction and sentence on one count of transportation of dangerous drugs for sale. He asserts the superior court improperly denied his pretrial motion to suppress drug evidence seized from his vehicle after a traffic stop. For the following reasons, we affirm Douglas's conviction and sentence.

### FACTS[1] AND PROCEDURAL BACKGROUD

**¶2** A grand jury indicted Douglas on one count of transportation of dangerous drugs for sale after an Arizona Department of Public Safety Trooper initiated a traffic stop of Douglas's truck and ultimately found 40 individually packaged bundles of methamphetamine behind the driver's seat. Before trial, Douglas moved to suppress the drug evidence, arguing the Trooper (1) lacked reasonable suspicion justifying the stop and (2) unlawfully prolonged the stop's duration. The court held a suppression hearing on the motion, where only the Trooper testified. The State also presented a dash-camera recording of the encounter.

**¶3** The Trooper testified that he was patrolling traffic on April 30, 2019, when he followed and stopped a "lifted" pickup truck—one with a raised center of gravity—for traveling without rear fender splash guards ("mud flaps"), in violation of A.R.S. § 28-958.01. At the stop, he immediately noticed an "Oklahoma State Trooper support sticker" on the truck's back window. The sticker drew the Trooper's attention because he rarely sees such stickers and drug traffickers often use them to project a law-abiding image in attempting to conceal their criminal activity. The Trooper made his way to the truck's passenger side where he contacted Douglas, the driver, and Cody Wayne Story, the only passenger. After collecting their

---

[1] In reviewing the superior court's ruling on a suppression motion, we consider only the evidence presented at the suppression hearing, viewing the facts in a light most favorable to upholding the ruling. *State v. Adair*, 241 Ariz. 58, 60, ¶ 9 (2016).

licenses and other relevant documents, he asked Douglas to accompany him to his patrol vehicle, and Douglas agreed. Douglas sat in the front passenger seat next to the Trooper. The Trooper's police-service dog, Lorka, was in the back-seat area.

¶4 The Trooper engaged Douglas in conversation while conducting records checks and preparing a warning ticket. Douglas said that he had just spent three days in Santa Barbara, California, visiting his grandmother. In discussing the trip, Douglas's "breathing increase[d]" and his chest "beat[ ] like crazy," making his "nervousness . . . evident" to the Trooper. Douglas's breathing stabilized when they conversed about Douglas's family and his job, but his physical signs of nervousness reappeared "any time [the Trooper] reference[d] or ask[ed] anything about his trip." The Trooper explained Douglas's behavior was suspicious because his nervousness never subsided, and "when somebody is . . . not involved in criminal activity, their nervousness and their anxiety [eventually] calms down[.]" The Trooper also noted Douglas had a spiderweb tattoo on his elbow, which "significantly relates to prison time."

¶5 During their conversation, the Trooper asked Douglas when he had last visited California before this trip. Douglas "tilted his head back all dramatically [and] closed his eyes," then said he had not been to California in three years. Douglas's reaction was a "huge indication of deception" to the Trooper because Douglas seemed to be "looking for the answer." The Trooper further identified Douglas's answer as an "obvious lie" based on information he had already retrieved from a license-plate-reader database showing the truck—which, Douglas told the Trooper, only he drove—had traveled in California just one month earlier.

¶6 Around eight minutes after the Trooper and Douglas entered the patrol car, the Trooper walked back to the truck to obtain its vehicle identification number ("VIN") and return Story's identification. Douglas waited in the patrol car with Lorka. While at the truck, the Trooper asked Story about his travels. Story explained that he and Douglas had been visiting Douglas's grandparents in California but he could not remember the name of the town. Story was "very, very anxious," breathing so heavily "[i]t looked like he was going to pass out[,]" and "look[ed] side to side as if he was looking for the answer." Story was "the most nervous [the Trooper had] ever seen a passenger in [his] career." Story's behavior and responses led the Trooper to surmise he was giving a "rehearsed" account.

¶7 The Trooper soon returned to the patrol car, printed out the warning, gave it to Douglas to review and sign, and ultimately issued the

completed warning approximately 12 minutes after initiating the stop. Following a brief pause, the Trooper asked Douglas a series of questions about criminal activity, including whether he was transporting contraband and for consent to search his truck. Douglas denied possessing any contraband and declined the search request. The Trooper then asked permission to "run [Lorka] around the exterior of the vehicle," and Douglas agreed. The dash-camera video shows roughly 50 seconds had elapsed between the warning's delivery and Douglas's consent. Lorka quickly alerted to the truck's window, and the ensuing search yielded 50 pounds of methamphetamine.

¶8 The superior court denied Douglas's suppression motion, finding: (1) the Trooper credibly determined that the truck was lifted based on his general vehicular knowledge and "his apparent[ ] fondness with this particular vehicle"; (2) even if his lift assessment was incorrect, he relied on "an objectively reasonable mistake of fact that was made in good faith"; (3) the encounter following the warning's delivery was consensual; (4) assuming the encounter was not consensual, the Trooper had reasonable suspicion to prolong the stop.

¶9 Douglas later waived his right to a jury trial. Following a bench trial, the superior court found Douglas guilty as charged and sentenced him to ten years' imprisonment. We have jurisdiction to hear Douglas's timely appeal under A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033.

**DISCUSSION**

¶10 Arguing the superior court erred by refusing to suppress the drug evidence, Douglas reasserts his contentions that the Trooper (1) lacked reasonable suspicion to stop his truck for the mud-flap violation and (2) unlawfully prolonged his detention, thereby invalidating his eventual consent to the dog sniff.[2] "In reviewing a trial court's decision on a motion to suppress evidence based on an alleged Fourth Amendment violation, we defer to the trial court's factual findings, . . . but we review de novo mixed questions of law and fact and the trial court's ultimate legal conclusions as to whether the totality of the circumstances warranted an investigative

---

[2] Because Douglas does not challenge the validity of his consent or the dog sniff, we do not address those issues. *See State v. Carver*, 160 Ariz. 167, 175 (1989) ("Failure to argue a claim usually constitutes abandonment and waiver of that claim.").

detention and whether its duration was reasonable." *State v. Teagle*, 217 Ariz. 17, 22, ¶ 19 (App. 2007).

## I.     Reasonable Suspicion for the Traffic Stop.

**¶11**          Douglas asserts the Trooper impermissibly stopped him because "there was no violation of the [mud-flap] statute, and any mistake of law or fact was not objectively reasonable." Specifically, despite conceding his truck's tires were "slightly larger" than stock size, he contends the State failed to establish the tires raised the truck's center of gravity to trigger the mud-flap requirement.

**¶12**          The United States and Arizona Constitutions prohibit unreasonable searches and seizures. U.S. Const. amends. IV, XIV; Ariz. Const. art. II, § 8; *State v. Allen*, 216 Ariz. 320, 323, ¶ 9 (App. 2007). Courts must exclude from a criminal trial all evidence obtained in violation of those prohibitions, absent a valid exception. *State v. Peoples*, 240 Ariz. 244, 247, ¶ 9 (2016).

**¶13**          Although an investigatory stop of a vehicle constitutes a seizure, it is less intrusive than an arrest, and police officers therefore "need only possess a reasonable suspicion that the driver has committed an offense to conduct a stop." *State v. Kjolsrud*, 239 Ariz. 319, 322, ¶ 9 (App. 2016) (cleaned up). "Thus, an officer who has witnessed a traffic violation may initiate a stop." *Id.* "By definition, reasonable suspicion is something short of probable cause." *State v. O'Meara*, 198 Ariz. 294, 296, ¶ 10 (2000). Reasonable suspicion must exceed a mere inchoate hunch but is "considerably less than proof of wrongdoing by a preponderance of the evidence," demanding only a "'minimal level of objective justification.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)).

**¶14**          In relevant part, § 28-958.01 requires motorists to attach mud flaps to certain pickup trucks—including Douglas's—if they have "been modified from the original bumper height design to raise the [truck's] center of gravity." *See* A.R.S. § 28-958.01(A), (C)(1). Here, the Trooper testified that he observes "thousands" of vehicles while monitoring traffic, and when he first saw Douglas's truck, he immediately noticed that "it was li[f]ted above stock height, whether it be tires or suspension, . . . based on the way the vehicle drove down the road as well as the appearance of the vehicle," and "it was obvious to [him] it needed mud flaps," which were missing. The Trooper further explained that he is particularly familiar with Douglas's vehicle because it is his "dream truck." The Trooper later

examined the truck's tires and confirmed that they were oversized, thereby raising the center of gravity. Therefore, the Trooper articulated an objectively reasonable basis for suspecting Douglas had violated § 28-958.01.

¶15 Douglas cites purported discrepancies in the Trooper's testimony to argue his lift assessment was unreasonably incorrect. But Douglas presented his credibility challenge in the superior court, and the court nonetheless accepted the Trooper's account. Nothing on this record overcomes our deference to that finding. *See Teagle*, 217 Ariz. at 22, ¶ 19. Moreover, Douglas effectively invites us to reweigh the evidence and reassess credibility, which is not our function. *See id.* And there is no merit in Douglas's additional complaint that the stop was pretextual. *See State v. Vera*, 196 Ariz. 342, 343, ¶ 5 (App. 1999) (explaining an officer's subjective motives do not invalidate an otherwise lawful traffic stop).

¶16 Finally, even assuming the Trooper committed mistakes of fact or law in determining the truck was lifted, such mistakes do not render a stop unconstitutional unless they are unreasonable. *See Heien v. North Carolina*, 574 U.S. 54, 57 (2014) (explaining the Fourth Amendment tolerates reasonable mistakes of law and fact); *State v. Moreno*, 236 Ariz. 347, 352, ¶¶ 11, 18 (App. 2014) (upholding a stop when the facts as believed by an officer supported reasonable suspicion for a traffic violation); *United States v. Gonzales-Quinonez*, 287 F. Supp. 2d 1032, 1037 (D. Ariz. 2003) (finding officer's testimony was sufficient "to demonstrate his reasonable suspicion that there was a violation of [a statute], even if he was 'not certain about exactly what it takes to constitute a violation'" (quoting *United States v. Mariscal*, 285 F.3d 1127, 1130 (9th Cir. 2002))). Accordingly, because the Trooper reasonably believed Douglas had committed an equipment violation, the superior court did not err in rejecting Douglas's challenge to the initial traffic stop.

## II. Reasonable Suspicion of Criminal Activity.

¶17 Douglas next argues the Trooper unlawfully lengthened his detention. Specifically, he asserts (1) the extended encounter was not consensual and (2) the Trooper lacked reasonable suspicion justifying the stop's prolonged duration.

¶18 "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Authority for the seizure

thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* A stop's mission includes checking a driver's license, attending to safety concerns, determining if the driver has outstanding warrants, and inspecting the vehicle's registration and proof of insurance. *Id.* at 355; *see also State v. Urrea*, 242 Ariz. 518, 522, ¶ 10 (App. 2017) ("A check of a VIN number is a permissible inquiry sufficiently related to a traffic stop."), *vacated in part on other grounds*, 244 Ariz. 443 (2018).

¶19 After an officer has accomplished the stop's mission, "the driver must be permitted to proceed on his way without further delay or questioning" unless (1) the encounter becomes consensual or (2) the officer has by that time developed reasonable suspicion of other criminal activity. *Teagle*, 217 Ariz. at 23, ¶ 22. If the officer unjustifiably prolongs the detention on "unrelated inquiries," the seizure violates the Fourth Amendment even if that additional intrusion is *de minimis*. *Rodriguez*, 575 U.S. at 354-56. But "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

¶20 As an initial matter, there is no dispute that the Trooper had completed the stop's purpose once he issued the warning. Douglas argues, however, the Trooper also unnecessarily delayed the stop earlier in the encounter by "taking [him] to his patrol car, questioning him, then returning to his car, and questioning the passenger, and running a check as to when and where the truck had travelled."

¶21 Contrary to Douglas's assertion, the dash-camera video shows the Trooper executed the complained-of activities while diligently performing tasks reasonably related to the stop's purpose, including preparing the warning, checking licenses, conducting record checks, examining the door panel and tires, and obtaining the VIN—all of which he accomplished in about 11 minutes. *See Rodriguez*, 575 U.S. at 355; *see also United States v. Villafranco-Elizondo*, 897 F.3d 635, 641 (5th Cir. 2018) (stating "[l]aw enforcement officers have some latitude when speaking to a suspect during a routine traffic stop," including asking questions about a trip's purpose and itinerary). Douglas's argument is meritless because he fails to demonstrate the purportedly unrelated endeavors measurably extended the stop's duration. *See Johnson*, 555 U.S. at 333; *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977) (permitting officers to order drivers to exit their vehicles at a traffic stop); *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013) (explaining officers at a traffic stop "may request that

the driver sit in the patrol car to answer questions"). Therefore, we conclude the stop's extension began when the Trooper delivered the completed warning.

**¶22** Assuming *arguendo* that Douglas did not consent to the extended encounter, and the additional questioning therefore constituted a seizure, we agree with the superior court that the Trooper reasonably suspected Douglas and Story might be engaged in drug trafficking. In determining whether an officer possessed reasonable suspicion, we consider "such objective factors as the suspect's conduct and appearance, location, and surrounding circumstances, such as the time of day, and taking into account the officer's relevant experience, training, and knowledge." *State v. Fornof*, 218 Ariz. 74, 76, ¶ 6 (App. 2008).

**¶23** Here, the Trooper testified that he had been a law enforcement officer for over 12 years and conducted more than 10,000 traffic stops. In that time, he had received "extensive training on drug investigations," taken classes on interview and interrogation techniques, attended criminal-interdiction conferences, and worked routinely with experienced drug-interdiction officers. Based on that training and experience, he identified several objective reasons supporting his suspicion of criminal activity: (1) the truck's license-plate-reader information conflicted with Douglas's reported travel history, *see State v. Valenzuela*, 121 Ariz. 274, 276 (1979) ("A false answer in response to questions by the police based on the police officer's personal knowledge may constitute probable cause."); (2) the law-enforcement-support sticker reflected a common practice in drug trafficking, *see United States v. Christian*, 43 F.3d 527, 530 (10th Cir. 1994) (considering a police-association sticker in determining reasonable suspicion); and (3) Douglas's tattoo suggested that he may have spent time in prison, *see State v. Woods*, 236 Ariz. 527, 530, ¶ 12 (App. 2015) ("[A] suspect's criminal history is part of the 'totality of the circumstances' that informs an officer's reasonable suspicion of criminal activity.").

**¶24** Furthermore, although "courts must be wary of granting much weight to a law enforcement officer's subjective observation that a defendant was nervous[,] . . . 'dramatic' indications of nervousness may contribute substantially to a suspicion of criminal activity." *State v. Magner*, 191 Ariz. 392, 397, ¶¶ 14-15 (App. 1998), *disapproved of on other grounds by O'Meara*, 198 Ariz. at 296, ¶ 9; *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (explaining "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"). The superior court credited the Trooper's testimony that Douglas and Story exhibited physical signs of extreme nervousness—substantially more than the average driver or passenger—and that

Douglas's nervousness subsided only while conversing about topics unrelated to his trip. *See State v. Riley*, 196 Ariz. 40, 45, ¶ 15 (App. 1999) (considering a suspect's nervousness and responses to questions in finding an officer had reasonable suspicion). Nothing in the record overcomes our deference to the superior court's finding. *See Teagle*, 217 Ariz. at 22, ¶ 19.

**¶25** To be sure, each of those pieces of information might have an innocent explanation, but "[s]eemingly innocent behavior can form the basis for reasonable suspicion if an officer, based on training and experience, can perceive and articulate meaning in given conduct[,] which would be wholly innocent to the untrained observer." *State v. Boteo-Flores*, 230 Ariz. 105, 108, ¶ 12 (2012) (cleaned up). And we do not "parse out each individual factor, categorize it as potentially innocent, and reject it"; instead, "[t]here is a gestalt to the totality of the circumstances test." *O'Meara*, 198 Ariz. at 296, ¶ 10. Applying those principles here, the aggregated factors amount to reasonable suspicion of drug-related activity, based solely on information the Trooper had gathered before completing the stop's mission.

**¶26** Moreover, Douglas relies on *State v. Sweeney*, 224 Ariz. 107 (App. 2010), to argue the Trooper lacked reasonable suspicion. In *Sweeney*, an officer issued the defendant a warning and wished him a safe trip, then moments later asked to search the defendant's car and to conduct a dog sniff. *Id.* at 109-10, ¶¶ 3-5. When the defendant declined and attempted to leave, the officer grabbed the defendant, detained him, and directed him to stand in front of the patrol car. *Id.* at ¶¶ 5-6. The police searched the car and found cocaine. *Id.*

**¶27** We determined that the officer's second seizure was unlawful because it was improperly triggered by the defendant's consent refusals. *Id.* at 115, ¶ 32. We also concluded that the officer did not possess reasonable suspicion based on the information he had acquired before the defendant declined the search requests, factors we summarized as "observing a foreign national driving a clean, deodorized rental car with an atlas . . . questioned outside in three degree weather . . . [who] failed to articulate with specificity the places he had visited . . . in an unfamiliar city." *Id.* at 113, ¶¶ 23-24. Douglas argues the reasonable-suspicion factors in his case are sufficiently similar to those in *Sweeney* so as to compel the same conclusion. We disagree.

**¶28** First, unlike the defendant in *Sweeney*, Douglas's initial refusal did not result in his detention, and he subsequently granted consent. Second, insofar as *Sweeney* provides guidance on factors that fail to support reasonable suspicion, the facts here are distinguishable. *Supra* ¶¶ 23-24.

9

Most notably, the State presented evidence of deception with no counterpart in *Sweeney*. *See Valenzuela*, 121 Ariz. at 276; *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 587 (2018) (noting "suspect's 'untruthful and evasive' answers to police questioning could support probable cause" (citing *Devenpeck v. Alford*, 543 U.S. 146, 149, 155-156 (2004))). Accordingly, this case is not analogous to *Sweeney*.

## CONCLUSION

**¶29** For the foregoing reasons, we affirm Douglas's conviction and sentence.



AMY M. WOOD • Clerk of the Court
FILED: AA